**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**
-------------------------------------------------------------X
                                    :

In re:                            :        Chapter 11

                                  :

BOOMERANG SYSTEMS, INC., *et al.*,[1]    :        Case No. 15-11729 (MFW)

                                  :

                                :

                  Debtors.    :        (Joint Administration Requested)

                                  :
-------------------------------------------------------------X

## DECLARATION OF JAMES V. GELLY IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS OF
## BOOMERANG SYSTEMS, INC. AND ITS AFFILIATED DEBTORS

Under 28 U.S.C. § 1746, I, James V. Gelly, hereby declare as follows under the penalty of perjury:

1.      Since January 13, 2015, I have been a director and the Chief Executive Officer of Boomerang Systems, Inc. ("Boomerang Systems"), which in turn is the 100% owner of Boomerang Sub, Inc. ("Boomerang Sub"), Boomerang USA Corp. ("Boomerang USA"), and Boomerang MP Holdings, Inc. ("Boomerang MP," together with Boomerang Systems, Boomerang Sub, and Boomerang USA, the "Debtors" or "Boomerang").  Prior to being appointed Boomerang's CEO, I acted as an independent consultant for the Debtors from 2012 to 2014.  Accordingly, I am very familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.  I am also familiar with the Debtors' turnaround and restructuring efforts.

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's identification number are as follows:  (i) Boomerang Systems, Inc. (6487) (Case No. 15-11729), (ii) Boomerang Sub, Inc. (3805) (Case No. 15-11731), (iii) Boomerang USA Corp. (0521) (Case No. 15-11732), and (iv) Boomerang MP Holdings Inc. (4081) (Case No. 15-11733).  The address for each of the Debtors is 30 A Vreeland Road, Suite 150, Florham Park, New Jersey 07932.

2.      I have over 25 years of experience in finance and management at global industrial and technology companies.  Prior to joining Boomerang, I served as Executive Vice President and Chief Financial Officer of Constellium N.V., a global producer of aluminum products, from January 2011 to November 2011.  Prior to that, I served as Executive Vice President and Chief Financial Officer of Misys PLC, a London Stock Exchange-traded software company providing financial and healthcare industry applications, from November 2008 to May 2010.  Prior to that, I was Senior Vice President and Chief Financial Officer of Ingersoll-Rand, a global industrial technology company, from 2007 to 2008.  Before Ingersoll-Rand, I served as Senior Vice President and Chief Financial Officer of Rockwell Automation, a global leader in the industrial automation industry, from 2004 to 2007.  From 1994 to 2003, I worked at Honeywell International in a variety of positions, including five years as Vice President and Treasurer.  I also worked at General Motors Corporation from 1987 to 2003 in a number of financial roles.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      I submit this declaration (the "Declaration") in support of the Debtors' petitions and the "first day" motions and applications, described further below (collectively, the "First Day Motions").  I am familiar with the contents of each First Day Motion (including the attachments thereto), and, to the best of my knowledge, after reasonable inquiry, discussions with other employees, and through my review of the

Debtors' books, records, and other information, I believe that the relief sought by the Debtors in the First Day Motions is necessary:  (a) to enable the Debtors to continue to operate as debtors in possession during the course of their respective chapter 11 cases with minimal interruption, (b) is critical to the Debtors' efforts to preserve value and maximize recoveries, and (c) best serves the Debtors' estates and their creditors' interests.  Further, I believe that the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals of these chapter 11 cases.

5.       Except as otherwise indicated, all statements in this Declaration are based upon (a) my personal knowledge, (b) my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, management, or other professionals that I believe in good faith to be reliable, (c) or my opinion based on my experience with the Debtors' operations and financial condition.  If called upon to testify, I could and would competently testify to each of the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## PRELIMINARY STATEMENT

6.       Boomerang is an innovative company that is on the frontline of automated parking systems with its robotic parking system, the trademark "RoboticValet®."  The RoboticValet® is exactly as named:  a robotic valet.  The "valet" is a low-profile, omni-directional robot that carries vehicles parked on steel trays to and from spaces by "driving" them directly on a concrete slab without use of a rack, rail, or track.  The entire parking transaction is designed to be automated.

7.      The RoboticValet® provides distinct advantages over other automated parking systems.  For example, its uses approximately half the space of conventional human-parked parking lots, can travel in any direction in the garage alleviating traffic jams associated with other automated systems, virtually eliminates the risk of danger to humans as none may enter the garage while it is in operation, and greatly reduces accidental property damage and theft.

8.      But because RoboticValet® is cutting edge technology – Boomerang is the only company in the world using this method – its products are also unfamiliar to many of its prospective customers.  This has required Boomerang to expend significant capital on marketing and education, including constructing and maintaining a demonstration facility to showcase the automated parking systems to customers.  Additionally, Boomerang has spent millions of dollars on research and product development (and must continue to expend resources to improve its product and to enforce its intellectual property rights).

9.      Since Boomerang entered the automated parking systems market in 2008, its revenue has grown substantially:  from approximately $718,000 in 2010 to approximately $5.45 million in 2014.

10.     But despite its substantial growth in revenue, Boomerang is not yet profitable.  As a result, Boomerang relies on the debt and equity markets to fund operations during these startup and growth years.  However, one lender's purposeful refusal to provide necessary funding to Boomerang pursuant to a loan and security agreement dated June 16, 2013, and all amendments thereto, (the "Loan and Security

4

Agreement"), at a critical juncture of Boomerang's operations has created a domino effect leading to a rapid, and irreversible, downward spiral of Boomerang's financial wherewithal.

11.     Beginning in April 2015, Boomerang made repeated requests to Parking Source, LLC ("Parking Source"), the Agent and a Lender (both defined below) under the Loan and Security Agreement, to fund its remaining $1.6 million obligation.  But, from April 2015 through July 2015, Parking Source, through its member and manager, Harvey Hernandez, continued to delay funding its $1.6 million commitment.  On July 16, 2015, Hernandez represented that neither he nor Jesus Quintero (the only other member of Parking Source) would fund that amount and indicated their intent to default under the Loan and Security Agreement.

12.     Boomerang needed that $1.6 million to fund its operations until later in the year, by which time Boomerang planned to have secured an additional $10-15 million in an equity offering.  In fact, Boomerang had been engaged in preparation and marketing of the equity offering to new investors since March 2015.  Due to Parking Source's default, however, Boomerang had insufficient liquidity to complete the equity offering.

13.     Further, on or around April 21, 2015, a final arbitration award for approximately $1.517 million was issued against Boomerang resolving a dispute with Crescent Heights R&D LLC, a real estate developer, over a "rack-and-rail" parking system that it purchased from Boomerang.  Boomerang made the first payment of this

5

arbitration award on May 21, 2015 and, to date, Boomerang has paid approximately $1.3 million of the approximately $1.517 million owed.

14.     Because of the lack of liquidity caused by Parking Source's default, Boomerang Systems and its affiliated debtors have sought chapter 11 protection to stabilize their business so that they may continue to develop and sell its innovate robotic parking systems.

15.     In order to effectuate this restructuring, Boomerang has obtained postpetition financing from Game Over Technology Investors, LLC, as agent for itself and other lenders, in the amount of at least $2.5 million to finance the Debtors' operations pending confirmation of a chapter 11 plan of reorganization.

16.     This Declaration is organized in four Parts.  Part I of this Declaration provides an overview of the Debtors' business, corporate structure, and prepetition indebtedness.  Part II describes the circumstances surrounding the commencement of these chapter 11 cases.  Part III describes the goal of these chapter 11 cases.  Part IV sets forth relevant facts in support of the First Day Motions.

## PART I:  The Debtors and Their Innovative Business

**A.     The Debtors' History and Operations**

17.     Boomerang markets, designs, engineers, manufactures, installs and, services its automated parking systems in the United States and Canada, including its trademark "RoboticValet®" product.

i.      **History of the Debtors and Their Automated Parking Products**

18.     Prior to 2008, Boomerang developed and marketed automated self-storage systems to provide the space efficiency, security, and convenience of 100% drive-up accessible vertical self-storage in densely populated urban locations with high real estate values.  This system, called Boomerang's "Automated Locker Retrieval System," held steel storage containers in a rack system with an open atrium and shuttles that move along a rail that transports containers back and forth between storage locations and ground floor loading bays (referred to in the automation business as a "rack-and-rail" system).  While promoting its self-storage system, Boomerang received inquiries to provide additional space-saving automated parking systems.

19.     In response to those customer inquiries, in 2008, Boomerang began to develop its automated parking systems and expand its product line, including development of its first-generation rack-and-rail parking system.  Boomerang's rack-and-rail parking system competed with rail or track automated parking systems offered by other automated parking providers and required a floor-to-ceiling atrium in a structure to accommodate retrieval machinery.

20.     To increase the efficiency, reliability, and capacity of its automated parking systems, and to provide an automated parking system unique in the U.S. markets, in or around 2009, Boomerang began to develop a robotic parking system equipped with autonomous guided vehicles, with the trademark RoboticValet®.

21.     By 2011, Boomerang had manufactured, assembled, tested, and delivered its first RoboticValet® system for commercial use.  Boomerang is the developer and sole

7

provider of the RoboticValet®.  The RoboticValet® is designed to be exactly as its name

suggests, an automated, robotic valet.  The human driver parks his or her car in a port

and can retrieve it electronically using a kiosk.

22.    Below is a true and accurate image of the robot in the RoboticValet®.



23.    The RoboticValet® system is unique in the marketplace with distinct

advantages over other parking systems historically offered by competitors.  For instance,

a RoboticValet® garage can park up to 100% more cars than a conventional human-

parked garage, improve the user's parking experience, increase safety, prevent theft or

damage, is environmentally friendly, and eliminates the risk of a single point of failure

found in traditional rack-and-rail systems.

24.     Due to the benefits and the widespread adoption of automated parking systems in Europe and Asia, the increased efficiency, capacity, and other benefits offered by RoboticValet® as compared to traditional rack-and-rail systems, and the singularity of such technology in the United States and Canada, in 2013, Boomerang ceased pursuing its legacy rack-and-rail systems and began focusing exclusively on its innovative RoboticValet® product in the United States and Canada.

### ii.     Boomerang's Organizational Structure

25.     Boomerang Systems is the direct parent company and 100% owner of its debtor subsidiaries Boomerang Sub, Boomerang USA, and Boomerang MP.  A chart showing Boomerang's organization structure as of the Petition Date is attached hereto as **Exhibit A**.

26.     Boomerang Sub is the operating business of Boomerang Systems.  These two Debtors are integrated businesses with common management, which share key financial and operational systems.  Boomerang USA and Boomerang MP are inactive legacy entities that were used to facilitate certain joint ventures.

27.     Boomerang System's Board of Directors is comprised of the following individuals:  Mark Patterson (Chairman), James Gelly (Director), Chris Mulvihill (President and Director), Joseph Bellantoni (Director), Maureen Cowell (Secretary and Director), Anthony Miele (Director), David Koffman (Director), and Kevin Cassidy (Director).

28.     Boomerang's corporate headquarters are in Florham Park, New Jersey. Boomerang also has a demonstration center in Hamburg, New Jersey, a design and

engineering center in Logan, Utah, and research, design, testing, and manufacturing facilities in Fort Pierce, Florida.

29.     Boomerang Systems is a publically held Delaware corporation that is traded over the counter under the ticker symbol BMER.  As of the Petition Date, Boomerang Systems had approximately 18.2 million shares of its common stock outstanding.

### iii.     Boomerang's Sales Networks and Customers

30.     Due to its revolutionary technology, Boomerang has test and commercial facilities where it can demonstrate its RoboticValet® in order to advance its sale efforts. Boomerang has utilized its Hamburg, NJ RoboticValet® test unit to showcase its system to potential customers.  Also, on June 6, 2013, Boomerang entered into a marketing agreement with its first commercial RoboticValet® project, BrickellHouse Holding, LLC ("BrickellHouse"), pursuant to which BrickellHouse allowed Boomerang to use its parking system for sales and marketing purposes in exchange for a royalty for each sale of a system equal to 2% of the purchase price of that system, not to exceed an aggregate of $2 million.

31.     Boomerang targets residential apartments and condominiums, office complexes, car dealerships, public garages, hospitals, casinos, hotels, airports, service facilities, and universities.  Since it entered the automation business, Boomerang had installed one automated parking system, a rail-and-rack system in Florida, for commercial use.  As explained in detail below, that parking system became the subject of a protracted litigation and arbitration that resulted in a $1.517 million arbitration award against Boomerang.

32.     Before the Petition Date, Boomerang notified its contract partners that it could no longer provide services under the relevant contracts at two in-progress RoboticValet® projects in Miami, Florida (the "BrickellHouse Project") and Champaign, Illinois (the "Champaign Project").  In addition to those two projects, Boomerang also has two contracts to install RoboticValet® systems at locations in Lawrence, Kansas and Hollywood, Florida.

### iv.     Boomerang's Employees

33.     As of the Petition Date, Boomerang had 36 full-time employees, none of which are unionized.  In the past, the Debtors have also retained the services of independent contractors and part-time employees.  As of the Petition Date, the Debtors do not have any independent contractors or part-time employees.

34.     Boomerang's average, aggregate, bi-weekly, gross payroll, including wages and salaries and certain withholding obligations, is approximately $130,000 dollars (although there may be fluctuations, for example, during holiday periods). Employees are paid in arrears, on a bi-weekly basis, typically every other Friday, with direct deposits or checks issued on the Friday after the close of each pay period.

35.     Boomerang's last payroll prior to the Petition Date was made on August 7, 2015, covering wages and salaries earned from July 18, 2015 through July 31, 2015.  The next payday is scheduled for August 21, 2015, covering the pay period August 1, 2015 through August 14, 2015.

36.     As of the Petition Date, the Debtors owed approximately $130,000 in gross earned, but unpaid prepetition wages and salaries for its employees (including

applicable withholding obligations but excluding payroll tax obligations), which would be paid as part of the August 21, 2015 payroll.

### v.    Boomerang's Intellectual Property

37.    Boomerang has filed patent applications with respect to key aspects of its automated parking and self-storage systems.  As of the Petition Date, Boomerang has been awarded patents on a variety of automated self-storage system and components related to its RoboticValet® and automated guided vehicles, which are used in its robotic parking systems.  Boomerang also has numerous patent applications pending worldwide with additional applications in the pipeline.  In addition, Boomerang has the rights to various trademarks, trade names, or service marks used in its business, including RoboticValet® and TrafficMaster®.

38.    As an innovator in the field of automated parking systems, Boomerang's patent estate and industry know-how is an important corporate asset and market differentiator as compared with other providers in the field.

### B.    Boomerang's Prepetition Debt

39.    As of the Petition Date, Boomerang had not yet turned a profit on its innovative automated parking systems.  Accordingly, Boomerang relied largely upon debt to fund its operations until it could build a sufficient market for its products to generate the sales necessary to achieve a profit.

40.    As of the Petition Date, the principal amount of debt outstanding was approximately $16.6 million.

i.      **Boomerang's Secured Debt:  The Loan and Security Agreement**

41.     On June 11, 2013, Boomerang Systems and its wholly-owned subsidiary

debtors Boomerang Sub, Boomerang USA, and Boomerang MP (collectively, the

"Borrowers"), entered into the Loan and Security Agreement with lenders (together

with any party which subsequently became a lender party, the "Lenders") and Parking

Source LLC, as agent for itself and the other lenders (the "Agent").  Pursuant to the

Loan and Security Agreement, the Lenders committed to fund $4,750,000 principal

amount of loans to the Borrowers and contemplated that the aggregate principal

amount may be increased to $10,000,000 through commitments from additional,

subsequent Lenders.

42.     On July 12, 2013 and August 6, 2013, the Borrowers entered into the First

and Second Amendments to the Loan and Security Agreement by which the additional

Lenders committed to fund an additional $3,100,000 principal amount of loans to the

Borrowers, bringing aggregate commitments under the Loan and Security Agreement

to $7,850,000.  On December 24, 2014, the Borrowers entered into the Third Amendment

by which the Lenders and incremental lenders committed to fund an additional

$7,050,000 principal amount of loans to the Borrowers, bringing aggregate

commitments under the Loan and Security Agreement to $14,900,000.  The Fourth

Amendment to the Loan and Security Agreement, dated as of April 1, 2015, increased

the maximum aggregate principal amount of borrowings to $14,950,000.

43.     As partial consideration for providing advances under the Loan and

Security Agreement, Boomerang Systems agreed to issue to each Lender warrants to

purchase 20,000 shares of its common stock for each $100,000 advanced. The warrants are exercisable at $5.00 per share, subject to full-ratchet adjustment for issuance below the exercise price, subject to certain exceptions. The warrants expire on June 6, 2018.

44.    The obligations under the Loan and Security Agreement are secured by a first priority lien in all tangible and intangible assets of Boomerang. The Loan and Security Agreement matures on May 31, 2016. As of the Petition Date, the total amount outstanding under the Loan and Security Agreement was approximately $13.35 million.

**ii.    The Debtors' Unsecured Debt**

45.    As of the Petition Date, the Debtors had a total of $3.73 million in unsecured debt outstanding.

*a. February 2008 Loan*

46.    Effective February 6, 2008, Boomerang became indebted for an unsecured loan to a third party (the "February 2008 Loan"). As of March 31, 2015, the principal balance of this loan was $80,538. The February 2008 Loan is not collateralized, bears interest at an annual rate of 10%, and is due on demand. As of the Petition Date, the total amount outstanding on the February 2008 Loan was approximately $128,260.

*b. 2011 Notes*

47.    In November and December 2011, Boomerang issued 6% convertible promissory notes in the aggregate principal amount of approximately $11.6 million ("2011 Notes"). The 2011 Notes are due five years after the respective date of issuance and were initially convertible into common stock at $4.25 per share, subject to weighted

average adjustment for issuances of common stock or common stock equivalents below the conversion price, subject to certain exceptions.

### c.  *June 2012 Notes*

48.     In June and July 2012, Boomerang issued 6% convertible promissory notes due on June 14, 2017 in the aggregate principal amount of $6.2 million ("June 2012 Notes"). The 2012 Notes were initially convertible into common stock at $5.00 per share, subject to weighted average adjustment for issuances of common stock or common stock equivalents below the conversion price, subject to certain exceptions.

### d.  *December 2012 Notes*

49.     In December 2012 and March 2013, Boomerang issued to subscribers 6% convertible notes due on December 28, 2017 in the aggregate principal amount of approximately $3.1 million (the "December 2012 Notes"). The December 2012 Notes were initially convertible into common stock at $5.00 per share, subject to full ratchet adjustment for issuances of common stock or common stock equivalents below the conversion price, subject to certain exceptions, and subject to weighted average anti-dilution adjustment for issuances of common stock as payment of interest on the Notes, the June 2012 Notes, and the December 2012 Notes. The entire principal amount of the December 2012 Notes, plus accrued and unpaid interest on October 31, 2014, was exchanged as part of the exchange offer on October 31, 2014 (described below).

### e.  *Exchange Offer of Certain Notes*

50.     On October 31, 2014, Boomerang completed an offer to exchange outstanding convertible notes and warrants, for the issuance of common stock at the

rate of $2.15 per share in exchange for the entire balance (principal and interest) of the notes and warrants issued with the applicable note.  Boomerang exchanged $20.5 million principal amount of the previously outstanding $20.9 million of convertible notes and 4,859,409 warrants for 9,583,384 shares of common stock in the exchange offer (the "Exchange Offer").  Following the Exchange Offer, $200,000 of the principal amount of the 2011 Notes and $200,000 of the principal amount of the 2012 Notes remained outstanding, at conversion ratios of $3.00 and $3.31 per share, respectively.

> *f.  SB&G Note*

51.    In March 2015, Boomerang and SB&G Properties, LC restructured $573,982 due to a related party for deferred rent through the issuance of a promissory note in the amount of $500,000.  The note accrues interest at a rate of 4% annually on the outstanding principal with all accrued principal and interest due on or before February 28, 2020.

> *g.  Trade Debt*

52.    As a seller, designer, manufacturer, and servicer of automated parking systems, Boomerang has over 150 vendors.  Boomerang does not generally have long-term supply agreements with its major vendors, which provides Boomerang the flexibility it requires due to the highly individualized nature of its customer agreements. As of the Petition Date, Boomerang estimates that it has approximately $2.72 million of unsecured trade debt and other outstanding operating expenses including liabilities to certain of their landlords.

### PART II:  Events That Lead Boomerang to Commence these Chapter 11 Cases

**A.**    **Boomerang's Recent Performance:  Revenues Rise, But Losses Continue**

53.    Although there are significant benefits to Boomerang's innovative automated parking systems, its products are still very new to the market.  Its RoboticValet® system is the only one like it in the world.  As such, Boomerang has spent a significant amount developing and testing the products and educating their potential customers on their benefits.

54.    But, despite its marketing and sales efforts, as of the Petition Date, Boomerang had only entered into four commercial contracts for the RoboticValet®.

55.    As a result of these and other factors, despite Boomerang's increasing revenues, Boomerang has not yet turned a profit.  The chart below shows Boomerang's financial performance since it entered the automated parking systems industry:

| Summary of Results of Operations from Consolidated Financial Statements (Approximate Dollars in Millions) | | | | | | |
|---|---|---|---|---|---|---|
| Fiscal Year[2] | 2010 | 2011 | 2012 | 2013 | 2014 | 2015[3] |
| Total Revenue | 0.72 | 1.59 | 1.15 | 2.72 | 5.45 | 2.35 |
| Operating Loss | (15.51) | (15.08) | (12.24) | (7.72) | (7.75) | (4.82) |
| Net Loss | (15.79) | (19.10) | (17.42) | (11.22) | (2.67) | (15.17) |

---

[2]    Figures are for fiscal year ending at close of September.

[3]    The 2015 figures are from the Debtors' unaudited financial statements as reported and refer to the six months ended March 31, 2015.

B.    **Arbitration Award for Breach of Contract**

56.    In April 2015, an arbitration award was issued wherein Boomerang was ordered to pay approximately $1.5 million for a rack-and-rail system that Boomerang had manufactured and installed in Florida.

57.    More specifically, on March 15, 2013, Crescent Heights R&D, LLC ("Crescent Heights"), filed a complaint against Boomerang in the state of Florida for fraud, breach of contract, specific performance, and equitable rescission which alleged an unspecified amount of damages in excess of the purchase price arising from a contract to provide a rack-and-rail automated parking system.  Boomerang subsequently successfully removed the matter to federal court, and, on May 17, 2013, the court granted Boomerang's motion to compel arbitration.  By agreement of the parties, an arbitration hearing took place in front of the American Arbitration Association in November 2014.

58.    On April 21, 2015, the arbitrator issued a final arbitration award denying Crescent Heights' claims of fraud in the inducement, equitable rescission based on fraud, and declaratory relief to strike the limitation of liability clause, but found Boomerang in breach of contract.  Crescent Heights was awarded damages of $1,197,890, plus attorneys' fees and costs of $319,920, which Boomerang is required to pay in fiscal year 2015.  As of the Petition Date, Boomerang had paid approximately $1.3 million of the total award.

C.    **Secured Lender Defaults Extinguishing Any**
      **Possibility of Securing Additional Funding**

59.    To date, Boomerang has relied on the debt and equity markets to fund

their operations until it can sustain its operations with its existing contracts.  But recent

events, caused by Parking Source's default of its obligations under the Loan and

Security Agreement, has extinguished Boomerang's ability to finance its operations

without filing for chapter 11.

60.    As detailed above, in or around April 2015, Boomerang began requesting

that Parking Source fund its remaining $1.6 million obligation under the Third

Amendment to the Loan and Security Agreement.  Boomerang repeated its requests on

numerous occasions between April and July 2015.  Boomerang's requests were always

met by Parking Source's reluctance to fund.

61.    In or around July 16, 2015, Hernandez informed Boomerang that Parking

Source would not fund the $1.6 million.  In fact, Hernandez expressly stated that he and

Quintero, Parking Source's only members, knew that its decision to default could lead

to Boomerang's bankruptcy and that Parking Source could then arrange for another

garage to take the cars currently being parked at the BrickellHouse Project when

Boomerang declared bankruptcy.

62.    Hernandez was correct.  Without the $1.6 million, Boomerang will not be

able to make more than a few additional payrolls.  Indeed, Boomerang was relying on

that $1.6 million to cover its operating expenses until late in the year, when Boomerang

anticipated that it would have up to an additional $15 million in financing provided by

an equity offering to new investors.

63.     In or around March 2015, Boomerang began preparing an equity offering that could have, and in my opinion based upon my experience in finance and with Boomerang, would have secured at least $10 million in additional liquidity for Debtors. Further, Boomerang had made an exchange offer, converting secured notes for new common shares, which would have relieved Boomerang of substantially all of its outstanding secured debt and vastly improve its capital structure.

64.     By the end of July 2015, it appeared that Boomerang would be successful in its equity offering if it could continue to operate until at least mid-September 2015, when the equity offering was expected to be completed.  At or around this time, however, Parking Source defaulted on its obligations to provide the $1.6 million. Parking Source's default created a cash crunch and caused Boomerang to focus its efforts on funding alternatives and contingency planning.

65.     The dominos sent tumbling by Parking Source's default under the Loan and Security Agreement has forced Boomerang and its affiliated debtors to file these chapter 11 cases in order restructure and reorganize its business, as discussed below.

### PART III:  These Chapter 11 Cases

66.     The Debtors have commenced these chapter 11 cases to restructure and reorganize its business.  The Debtors believe that filing these chapter 11 cases to swiftly determine the best path to maximize value for their various stakeholders represents the best strategy.

A.    **Objectives of the Chapter 11 Cases**

67.    The Debtors intend to confirm a chapter 11 plan.  Due to Parking Source's

failure to fund the $1.6 million and the domino effect that led to an unexpected liquidity

crunch, the Debtors have not yet determined the exact reorganizational structure for the

estates.  However, the Debtors expect to file a proposed chapter 11 plan of

reorganization detailing the proposed reorganization and restructuring of its business

shortly.

B.    **Debtor in Possession Financing**

68.    Subject to Court approval, Boomerang has negotiated and reached an

agreement to enter into a debtor in possession credit facility with Game Over

Technology Investors, LLC, as agent for itself and other lenders, for at least $2.5 million

(the "DIP Facility").

69.    The DIP Facility will provide the Debtors sufficient liquidity to finance

their operations until emergence from chapter 11.  The Debtors are also seeking

authorization to use cash collateral on an interim basis, which, together with the DIP

Facility, will be used by Boomerang to support their working capital requirements and

other general corporate purposes as well as to satisfy the costs attendant to these

chapter 11 cases.  Without these expenditures, the Debtors will be forced to cease

operations, which would result in irreparable harm to their business and an inability to

preserve and maximize the value of their assets and operations.

70.    The terms and conditions of the DIP Facility (including the fees and

charges paid thereunder) and the use of cash collateral are fair and reasonable and were

negotiated by the parties in good faith and at arm's length after Boomerang and its

advisors concluded a good faith effort to obtain the most advantageous financing.

Boomerang was unable to obtain debtor in possession financing on more advantageous

terms.  Boomerang has determined, in its reasonable business judgment, that the DIP

Facility is the best financing option available under the present circumstances and will

enable Boomerang to operate its business in chapter 11 without disruption.

71.    Boomerang's ability to secure debtor in possession financing prior to

commencing these chapter 11 cases serves as crucial signal to its customers, employees,

and trade vendors that it will maintain viable and competitive business operations

going forward.

### PART IV:  The First Day Pleadings

72.    Concurrently with their chapter 11 petitions, the Debtors are filling the

following "First Day Motions" seeking orders granting various forms of relief.

73.    I have reviewed each of the First Day Motions, and I believe, among other

things, the relief requested in the First Day Motions is necessary to enable the Debtors

to operate with minimal disruption during the pendency of the chapter 11 cases and

approval of the relief sought therein will be critical to the Debtors' efforts to restructure

and reorganize their business in a manner that preserves and maximizes value for the

benefit of all stakeholders.

### A.    Joint Administration Motion

74.    The Debtors request entry of an order directing joint administration of

their chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule

1015(b).  More specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the case of parent company Boomerang Systems.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors other than Boomerang Systems to indicate the joint administration of the chapter 11 cases.

75.    Given the integrated nature of the Debtors' operations, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in these cases will almost certainly affect each of the Debtors.  Accordingly, an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

76.    Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.**    **Cash Management Motion**

77.    Under the Cash Management Motion, the Debtors request the entry of interim and final orders authorizing the Debtors to maintain certain existing bank accounts, including the payment of prepetition banking fees owed to financial

institutions;  to continue to use existing check stock and business forms;  and to

continue to use of the existing cash management system.

78.    In the ordinary course of business, the Debtors maintain nine accounts in

four different financial institutions.  The Debtors maintain their day-to-day operating

capital in Highlands State Bank and also maintain funds at Zions First National Bank

for the expenditure on certain projects where RoboticValet® is being installed or

serviced.

79.    Authorizing the Debtors to maintain their existing cash management

system will avoid many of the possible disruptions and distractions that could divert

their attention from more critical matters during the initial days of the chapter 11 cases.

80.    I believe that the relief requested in the Cash Management Motion is in the

best interests of the Debtors' estates, their creditors, and all other parties in interest, and

will enable the Debtors to continue to operate their business in chapter 11 without

disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash

Management Motion should be approved.

C.    **Tax Motion**

81.    The Debtors request the entry of an order granting the Debtors the

authority to pay any taxes that accrued or arose in the ordinary course of business prior

to the Petition Date.  In the ordinary course of business, the Debtors incur and/or

collect certain taxes and remit such taxes and fees to various authorities.  The Debtors

must continue to pay the taxes and fees to continue operating in certain jurisdictions

and to avoid costly distractions during these chapter 11 cases.  Specifically, it is my

understanding that the Debtors' failure to pay the taxes and fees could adversely affect the Debtors' business operations because the taxing authorities could suspend the Debtors' operations, file liens, seek to lift the automatic stay, or revoke the Debtors' tax incentives.  In addition, certain authorities may take precipitous action against the Debtors' directors and officers for unpaid taxes, which undoubtedly would distract those key employees from their duties related to the Debtors' restructuring.

82.     Finally, based on my knowledge and conversations with the Debtors' counsel, it is my understanding that certain of the Debtors' taxes are entitled to priority status under the Bankruptcy Code and, therefore, must be paid in full before any general unsecured obligations may be satisfied.

83.     I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to pay their taxes and assessments;  is in the best interests of the Debtors' estates, their creditors, and all other parties in interest;  and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**D.     Wages Motion**

84.     In the Wages Motion, the Debtors request the entry of interim and final orders authorizing the Debtors, in their sole discretion, to pay certain prepetition wage claims, to honor obligations, and to continue medical and benefits programs in the ordinary course of business and consistent with past practices relating to employee wages and certain benefits.

85.    As noted above, as of the Petition Date, the Debtors employ approximately 36 employees.  Although the Debtors have paid their wage, salary, and other employee obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition employee's obligations may nevertheless be due and owing.

86.    I believe that the majority of the Debtors' employees rely exclusively on their compensation, benefits, employee programs, and reimbursement of expenses provided by the Debtors to satisfy their daily living expenses.  Consequently, these employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations to the employees for unpaid compensation, benefits, and reimbursable expenses.  Moreover, I also believe that if the Debtors are unable to satisfy such obligations, employee morale and loyalty will be jeopardized at a time when employee support is critical.  In the absence of such payments, I believe that the Debtors will suffer irreparable harm and the Debtors' employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to reorganize.  It is my opinion that the loss of valuable employees and the recruiting efforts that would be required to replace such employees would be a massive and costly distraction at a time when the Debtors must focus on restructuring their operations.

87.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without

disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages

Motion should be approved.

**E.**     **Insurance Motion**

88.     The Debtors request the entry orders authorizing the Debtors to maintain

five insurance policies and pay all policy premiums arising thereunder or in connection

therewith continue their prepetition insurance coverage.  In the ordinary course of the

Debtors' businesses, the Debtors have maintained and continue to maintain a number

of insurance policies (collectively, the "Policies") that benefit the Debtors' estates,

including general liability and property, umbrella coverage, workers' compensation,

E&O coverage, and D&O insurance.  Continuation of the Policies is essential to the

preservation of the Debtors' businesses, property and assets, and, in many cases, such

coverage is required by various regulations, laws, and contracts that govern the Debtors'

business conduct.  It is my understanding that the U.S. Trustee for the District of

Delaware's operating guidelines require the Debtors to maintain certain insurance

including workers' compensation, general liability, and casualty insurance.

89.     I believe that the relief requested in the Insurance Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will

enable the Debtors to continue to operate their business in chapter 11 without

disruption.  I also believe that the relief requested in the Insurance Motion is necessary

to avoid immediate and irreparable harm that would result from the failure to authorize

the Debtors to maintain their Policies.

90.     Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**F.      Utilities Motion**

91.     In the ordinary course of business, the Debtors regularly incur utility expenses for water, sewer, electricity, gas, telephone service, cellular telephone service and Internet service.  The Debtors' aggregate average monthly cost for utility services is approximately $2,500.  The utility services are provided by approximately 7 utility companies.

92.     By the Utilities Motion, the Debtors request the entry of interim and final orders, pursuant to sections 105(a) and 366 of the Bankruptcy Code:  (a) determining that the Debtors' utility providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code;  (b) approving the Debtors' proposed offer of adequate assurance;  (c) prohibiting the Debtors' utility providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (d) establishing procedures for the Debtors' utility providers to seek to object to the Debtors' proposed adequate assurance procedures; and (e) determining that the Debtors are not required to provide any additional adequate assurance.

93.     As of the Petition Date and as qualified below, the Debtors are generally current on payments to the Utility Providers for utility services.  Overall, the Debtors have a long and established payment history with most of the Utility Providers

indicating consistent payment for utility services.  As of the Petition Date, however, the

Debtors may have had (a) prepetition accounts payable to certain Utility Providers,

(b) outstanding checks issued to certain Utility Providers in payment for prepetition

charges for utility services that had not cleared the Debtors' bank account prior to the

Petition Date, or (c) liabilities for prepetition utility services for which the Debtors had

not yet been billed.

94.      Access to utility services is critical to the Debtors' ongoing operations

during the reorganization and restructuring of the Debtors' business.  Should any

Utility Provider refuse or discontinue a utility service even for a brief period of time, the

Debtors' operations, distribution and sales capabilities, and administrative functions

would be severely disrupted.  Any such disruption would diminish the value of the

Debtors' estates.  In this regard, it is in the best interest of the Debtors, their estates, and

their creditors to maintain continuous and uninterrupted utility services during this

chapter 11 case.  Accordingly, the Debtors are seeking the relief requested therein.

**G.     Rejection Motion**

95.      The Debtors are requesting entry of an order authorizing and approving the

rejection of certain executory contracts (collectively, the "Contracts") *nunc pro tunc* to the

Petition Date.  The Debtors have determined that the Contracts are no longer necessary to

their ongoing business operations and are burdensome to the estates.  The Debtors have

therefore decided to eliminate the unnecessary expenses related to maintaining the

contracts.

96.    The Debtors will not utilize the Contracts after the Petition Date and, therefore, in order to alleviate unnecessary administrative costs for the estates, I believe that rejection of these contracts is appropriate, necessary, and justified under the business judgment standard.

*[continued on the following page]*

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on _Aug 18_ in _Florham Park_ NJ

/s/ J W Gelly
James V. Gelly
Chief Executive Officer
Boomerang Systems, Inc.