THIS COMBINED DISCLOSURE STATEMENT AND JOINT PLAN HAS NOT BEEN
APPROVED BY THE COURT

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------X
                                    :
In re:                              :         Chapter 11
                                    :
BOOMERANG SYSTEMS, INC., et al.,    :         Case No. 15-11729 (MFW)
                                    :
                    Debtors.        :         (Jointly Administered)
                                    :
----------------------------------------------------------------X

### JOINT COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

SULLIVAN & WORCESTER LLP

Jeffrey R. Gleit
1633 Broadway
New York, NY 10019
Tel:  (212) 660-3043
Fax:  (212) 660-3001

and -

HOGAN McDANIEL

Garvan F. McDaniel. (DE Bar No. 4167)
1311 Delaware Avenue
Wilmington, DE 19806
Tel:  (302) 656-7540
Fax: (302) 656-7599

Counsel for the Debtors and Debtors in Possession

A. M. SACCULLO LEGAL, LLC

Anthony M. Saccullo (DE Bar No. 4141)
Thomas H. Kovach (DE Bar No. 3964)
27 Crimson King Drive
Bear, Delaware 19701
Tel:  (302) 836-8877
Fax:  (302) 836-8787

Counsel for the Official Committee of
Unsecured Creditors

THIS COMBINED DISCLOSURE STATEMENT AND JOINT PLAN HAS NOT BEEN APPROVED BY THE COURT

THIS PLAN (THE "PLAN") WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

THE COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF GENERAL UNSECURED CREDITORS AND URGES SUCH CREDITORS TO VOTE IN FAVOR OF THE PLAN.

THE PLAN MEMORIALIZES AN AGREED-UPON ALLOCATION OF PROCEEDS BY AND BETWEEN THE COMMITTEE AND THE DEBTORS' ALLEGED PREPETITION SECURED LENDERS.  THIS ALLOCATION IS THE RESULT OF NEGOTIATIONS BETWEEN COUNSEL FOR THE COMMITTEE AND COUNSEL FOR THE PREPETITION SECURED LENDERS.

## **TABLE OF CONTENTS**

**Page**

## **EXHIBITS**

Exhibit A        Liquidating Trust Agreement

Exhibit B        Liquidation Analysis

Exhibit C        Budget

THIS COMBINED DISCLOSURE STATEMENT AND JOINT PLAN HAS NOT BEEN APPROVED BY THE COURT

# ARTICLE I.
## DEFINED TERMS AND RULES OF INTERPRETATION

A.      <u>Rules of Interpretation</u>

1.      For purposes of the Plan, unless otherwise provided herein:

(a)      whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural;

(b)      any reference in the Plan to an existing document or schedule Filed or to be Filed means such document or schedule, as it may have been or may be amended, modified or supplemented pursuant to the Plan;

(c)      any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns;

(d)      all references in the Plan to Sections and Articles are references to Sections and Articles of or to the Plan;

(e)      the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(f)      captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(g)      subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules;

(h)      the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the Plan; and

(i)      in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

B.      <u>Defined Terms</u>

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

"2011 Notes" means the 6% convertible promissory notes issued by the Debtors.

"2012 Notes" means the 6% convertible promissory notes issued by the Debtors.

"Accept" or "Accepted" means, with respect to the acceptance of the Plan by a Class of Claims, votes to accept the Plan (or deemed acceptance of the Plan pursuant to an order of the Bankruptcy Court or the applicable provisions of the Bankruptcy Code) by the requisite number

and principal amount of Allowed Claims in such Class as set forth in section 1126(c) of the Bankruptcy Code.

"Accrued Professional Compensation" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.  Payments made in connection with Accrued Professional Compensation shall be limited to the amounts set forth in the Budget attached to the amended DIP Loan.

"Administrative Claim" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Debtors' Estates and operating the businesses of the Debtors prior to the Effective Date; (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date.

"Administrative Claims Bar Date" means the deadline for filing an Administrative Claim, which Claims must be filed so as to be actually received on or before 5:00 p.m. prevailing Eastern Time on the date that is 30 calendar days after notice of the Effective Date, unless otherwise ordered by the Bankruptcy Court.

"Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"Allowed" means with respect to Claims:  (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no Proof of Claim has been timely Filed;  or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided, however, that with respect to any Claim described in clauses  (a) or (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court and the time period for filing such an objection has expired without being extended by the Bankruptcy Court;  provided, further, however, that the Claims described in clauses (a), (b) and (c) above shall not include any Claim on account of a right, option, warrant, right to convert other right to purchase an Equity Interest (which shall be deemed disallowed).  Except as otherwise specified in the Plan or an order of the Bankruptcy Court or with respect to Priority Tax Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  Any Claim that either: (i) has been or is hereafter listed in the Schedules as disputed, contingent, or unliquidated; or (ii) is not otherwise listed in the Schedules, and in either instance of subparagraph (i) or (ii) for which no Proof of Claim has been timely Filed, is

not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

"Assumed Executory Contract and Unexpired Lease Schedule" means the list of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the provisions of Article X hereof.

"Avoidance Actions" means any cause of action that may be asserted pursuant to chapter 5 and/or section 704 of the Bankruptcy Code and the proceeds therefrom (notwithstanding any definition in any other document).

"Ballot" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general local and chambers rules of the Bankruptcy Court.

"Boomerang" means Boomerang Systems, Inc., and where applicable, its affiliated Debtors.

"Budget" shall mean the budget attached to the First Amendment to the DIP Facility as approved by the Bankruptcy Court by Order dated December 21, 2015, and filed with the Bankruptcy Court on December 28, 2015.  For ease of reference, a copy of the Budget is attached hereto as Exhibit C.

"Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

"Cash" means legal tender of the United States of America.

"Causes of Action" means, without limitation, any and all Claims, causes of action, demands, rights, actions, suits, damages, injuries, remedies, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses and franchises of any kind or character whatsoever, known, unknown, accrued or to accrue, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or under any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, including, without limitation, all Debtor Causes of Action and all Avoidance Actions.

"Certificate" means any instrument evidencing a Claim or an Interest.

"Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

"Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

"Claims Bar Date" means, as applicable, (a) November 23 at 4:00 p.m. prevailing Eastern Time or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim.

"Claims Objection Deadline" shall mean 180 days after the Effective Date of the Plan, which deadline may be extended by further Order of the Bankruptcy Court.

"Claims Register" means the official register of Claims (other than LSA Claims) and Interests maintained by the Claims, Solicitation and Subscription Agent.

"Claims, Solicitation and Subscription Agent" means, Garden City Group located at 1985 Marcus Avenue, Lake Success, New York 11042, retained as the Debtors' Claims, Solicitation and Subscription Agent.

"Combined Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider approval and confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Committee" means the official committee of unsecured creditors of the Debtors appointed in these cases pursuant to section 1102 of the Bankruptcy Code.

"Committee Releasees" shall mean: (i) the current members of the Committee, each member's representatives, officers, directors, owners, members, managers and agents; and (ii) the Committee's Professionals.

"Cure" means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the

4

Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

"Customer Contract Claims" means those certain general unsecured claims arising from or in any way related to a contract by and between the Debtors and a customer for the construction, design, manufacture, maintenance, installation or operation of a parking garage, and any related or similar contracts or claims arising therefrom.

"Debtor" means one of the Debtors, in its individual capacity as a debtor and debtor-in-possession in the Chapter 11 Cases.

"Debtor Causes of Action" means all claims, actions, causes of action, chooses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code, including Avoidance Actions) of (or assertable by) any of the Debtors, the Debtors-in-Possession, and/or the Estates, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or instituted by the Liquidating Trust after the Effective Date against any entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether   asserted or unasserted as of the date of entry of the Confirmation Order. Notwithstanding the foregoing and for the avoidance of doubt, Debtor Causes of Action does not include any claims or causes of actions released or enjoined pursuant to Article XV hereof.

"Debtor Releasees" means (a) each of the Debtors; (b) each of the Debtors' respective advisors, attorneys, auditors and Retained Professionals, in each case acting in such capacity on or any time after the Petition Date; (c) James Gelly, Mark Patterson, David Koffman and Anthony Miele (as a result of their assignment of LSA Claims to the Liquidating Trust and efforts during these cases in connection with confirmation of the Plan and the Sale process); and (d) Rod Kirby and Ryan Campbell (as a result of their services rendered during these cases).

"Debtors" means, collectively, Boomerang Systems, Inc., Boomerang Sub, Inc., Boomerang USA Corp., and Boomerang MP Holdings Inc.

"Debtors-in-Possession" means, collectively, the Debtors as debtors in possession in the Chapter 11 Cases.

"DIP Agent" means Game Over Technology Investors, LLC, in its capacity as administrative agent under the DIP Facility.

"DIP Facility" means that certain Debtor in Possession Credit Agreement among the Debtors as borrowers, the Guarantors (as defined in the DIP Facility), any other persons designated therein as Credit Parties (as defined in the DIP Facility), the DIP Agent, and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

"DIP Facility Claims" means any secured Claim held by the DIP Lenders and/or the DIP Agent arising under or related to the DIP Facility and the other Loan Documents (as defined therein), which claim is currently estimated to be $2,250,000 plus interest and fees.

"DIP Lenders" means, collectively, the Lenders (as defined in the DIP Facility) party to the DIP Facility from time to time.

"DIP Lender Releasees" shall mean each of (a) Game Over Technology Investors LLC; (b) Peter Mulvihill; (c) Michael Dana; (d) Richard Kincaid; (e) Giovanini Investments, Ltd.; (f) John R. Herbert; (g) Devin I. Murphy; (h) John Blumberg; (i) Paul M. Bancroft Separate Property Trust III (and its principals and trustee); (j) Albert Behler; (k) Stafford Family Trust (and its principals and trustee); (l) James Mulvihill; (m) GOTI Manager, LLC, in its capacity as manager of GOTI; (n) Seignorage LLC and Phillip Altinger, member manager of Seignorage LLC, in its capacity as advisor to GOTI; (o) Mark Patterson; (p) James Gelly; and (q) David Koffman.

"Disputed Claim" means a Claim, or any portion thereof, that (i) has not been Scheduled by the Debtors or has been Scheduled at zero, or has been Scheduled as contingent, unliquidated, disputed or undetermined and for which no proof of claim has been timely Filed with the Bankruptcy Court, (ii) is in excess of the amount Scheduled as other than disputed, contingent or unliquidated, (iii) is the subject of an objection or request for estimation Filed in the Bankruptcy Court and which objection or request for estimation has not been withdrawn or overruled by a Final Order of the Bankruptcy Court, (iv) is a Subordinated Claim and/or (v) is otherwise disputed by the Debtors in accordance with applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order. No Claim shall be considered Allowed for the purposes of this Plan until the Claim Objection Deadline has run without an objection being filed.

"Distribution Agent" means (the Entity or Entities chosen by the Liquidating Trust to make or to facilitate distributions pursuant to the Plan, including the Liquidating Trust or any Third Party Distribution Agent.

"E&O Insurance" means the Debtors' errors and omissions insurance policy in effect on the Petition Date and the proceeds thereof.

"Effective Date" means the date selected by the Debtors that is at least one (1) Business Day after the entry of the Confirmation Order on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article XIV.B have been (i) satisfied or (ii) waived pursuant to Article XIV.C.

"Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

"Equity Interest" means any issued, unissued, authorized or outstanding shares of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, together with any options, warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date; provided, however, that Equity Interest does not include any Intercompany Interest.

"Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

"Excess Sale Proceeds" means those Net Sale Proceeds in excess of the first $500,000 (constituting the maximum amount of Professional Excess Sale Proceeds and Liquidating Trustee Excess Sale Proceeds) paid to the Estates in connection with the Sale.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Executory Contract" means a contract or lease to which one or more of the Debtors is a party with a counterparty other than another Debtor that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"Free and Clear Assets" means the assets of the Debtor against which, as set forth in the Final DIP Order, no liens, claims, security interests, or other rights to payments granted to the DIP Lender would attach, consisting of the following assets: (i) the Avoidance Actions and any proceeds therefrom; (ii) the Debtors' Officers and Directors Liability insurance policies, and the proceeds thereof; (iii) the E&O Insurance and the proceeds thereof; (iv) any cause of action that may be asserted against the Debtors' current or former officers and directors, and the proceeds therefrom (without regard to the source of the proceeds); (v) any cause of action that may be asserted against the Prepetition Lenders, and the proceeds therefrom or assets that were determined to be unencumbered in any such litigation.

"File," "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"Final DIP Order" means a that certain final order entered by the Bankruptcy Court on October 2, 2015 that granted the Debtors the authority to, among other things, use cash collateral, protect prepetition secured parties, modify the automatic stay, obtain postpetition financing, and grant liens [Docket No. 200], as amended on December 21, 2015 [Docket No. 341].

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or has been dismissed with prejudice; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"General Unsecured Claims" means any Claim against any of the Debtors that is not an Administrative Claim, Customer Contract Claim, Priority Tax Claim, DIP Financing Claim,

Other Priority Claim, Other Secured Claim, LSA Claim, Secured Tax Claim or Intercompany Claim.  For the avoidance of doubt, Rejection Damage Claims other than Customer Contract Claims are General Unsecured Claims.

"Gross Sale Proceeds" means the cash and other consideration received by the Estates from the Sale of the Debtors' Sale Assets that will occur in accordance with the bidding procedures approved by the Bankruptcy Court.

"Holder" means an Entity holding a Claim or Interest.

"Impaired" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"Intercompany Claims" means, collectively, any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

"Intercompany Interest" means an Equity Interest in a Debtor held by another Debtor or an Equity Interest in a Debtor held by an Affiliate of a Debtor.  For the avoidance of doubt, an Intercompany Interest excludes any Equity Interest in Boomerang Systems, Inc.

"Interests" means, collectively, Equity Interests and Intercompany Interests.

"Interim Compensation Order" means an order of the Bankruptcy Court allowing Retained Professionals to seek interim compensation in accordance with the procedures approved therein, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Retained Professional or otherwise.

"Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

"Liquidating Trust" means the trust established pursuant to that certain Liquidating Trust Agreement.

"Liquidating Trust Agreement" means the trust agreement establishing and governing the Liquidating Trust, substantially in the form of the document annexed as Exhibit "A" and incorporated herein by reference.

"Liquidating Trust Assets" means the Liquidating Trust Excess Sale Proceeds; 35% of the Excess Sale Proceeds; 50% of the Remnant Assets; 50% of the proceeds derived from litigating and/or settling the Debtor Causes of Action; and 100% of the proceeds derived from the Free and Clear Assets.  For the avoidance of doubt, if any Sale contemplates the settlement, release, purchase or other disposition of any Debtor Cause of Action, then 50% of the Sale Proceeds allocated to that Debtor Cause of Action in such Sale shall be included in the Liquidating Trust Assets.  Further, if any Sale contemplates the settlement, release, purchase or other disposition of any Free And Clear Asset, then 100% of the Sale Proceeds allocated to that Free and Clear Asset shall be included in the Liquidating Trust Assets.

"Liquidating Trust Excess Sale Proceeds" shall mean fifty-five percent (55%) of the Net Sale Proceeds not to exceed $275,000.

"Liquidating Trustee" means the individual or entity initially appointed by the Committee who shall (a) file a declaration of disinterestedness with the Bankruptcy Court; and (b) have the responsibility of administering the Liquidating Trust as set forth more fully in the Liquidating Trust Agreement.

"LSA Assets" means 65% of the Excess Sale Proceeds; 50% of the Remnant Assets; and 50% of the proceeds derived from litigating and/or settling the Debtor Causes of Action.  For the avoidance of doubt, if any Sale contemplates the settlement, release, purchase or other disposition of any Debtor Cause of Action, then 50% of the Sale Proceeds allocated to that Debtor Cause of Action shall be included in the LSA Assets.  Further, if any Sale contemplates the settlement, release, purchase or other disposition of any Free and Clear Asset, then 0% of the Sale Proceeds allocated to that Free and Clear Asset shall be included in the LSA Assets.

"LSA Claims" means claims held by the Prepetition Lenders arising under the Prepetition Credit Agreement.  For the avoidance of doubt, upon the Effective Date, the LSA Claims shall be deemed Allowed in the amount of $11,889,717, which does not include the Claim of Parking Source, LLC.

"LSA Deficiency Claims" means the claims that have been, or may have been, asserted by the PrePetition LSA Lenders and/or the PrePetition Administrative Agent (or any party on any of their behalf) as a General Unsecured Claim to the extent that the amount of the LSA Claims exceeds the value of the collateral pledged through the PrePetition Credit Agreement, as allocated under the Plan.  Pursuant to the PrePetition Lender Settlement, the PrePetition LSA Lenders shall be deemed to waive and release the LSA Deficiency Claims upon the Effective Date.

"Local Bankruptcy Rules" means the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware.

"Net Sale Proceeds" means to the Gross Sale Proceeds, *less*: (i) the consideration necessary to satisfy the DIP Facility Claims; (ii) any commission, success fee, incentive fee, or other compensation payable as a direct result of the Sale; and (iii) any taxes, fees, expenses, or other payments required to be made to consummate the Sale, or as a result of the consummation of the Sale, excluding Professional fees not referenced in (ii) above.

"Notes" means the 2011 Notes, 2012 Notes and the SB&G Note.

"Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

"Other Secured Claim" means any Secured Claim other than a LSA Claim or a Secured Tax Claim against any of the Debtors.  For the avoidance of doubt, Other Secured Claims shall not include DIP Facility Claims.

"Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, government or agency or political subdivision thereof or any other Entity.

"Petition Date" means August 18, 2015.

"Plan" means this *Joint Combined Disclosure Statement And Plan Of Liquidation Under Chapter 11 Of The Bankruptcy Code Proposed By The Debtors And The Official Committee Of Unsecured Creditors*, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or the terms hereof, including, without limitation, all exhibits and schedules hereto and thereto.

"Prepetition Administrative Agent" means Law Debenture in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement.

"Prepetition Credit Agreement" means that certain Loan and Security Agreement, dated June 11, 2013, by and between Boomerang and its wholly-owned subsidiary debtors Boomerang Sub, Boomerang USA, and Boomerang MP and Parking Source LLC, as agent for itself and the other lenders, as amended and supplemented from time to time. For the avoidance of doubt, Law Debenture has replaced Parking Source LLC as agent under the Prepetition Credit Agreement.

"PrePetition Lender/Committee Settlement" shall mean the terms of the proposed allocation of certain proceeds by and between the Holders of the Allowed LSA Claims and other claimants, as set forth herein. The terms and conditions of the PrePetition Lender Settlement are incorporated in, and an integral part of, this Plan, and will not become effective and binding until the Effective Date of the Plan.

"PrePetition LSA Lenders" means the lenders under the Prepetition Credit Agreement, as of the Petition Date.

"PrePetition LSA Releasees" means the PrePetition LSA Lenders, the PrePetition Administrative Agent, and counsel for the PrePetition Administrative Agent.

"Priority Tax Claim" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Professional" shall mean the Debtors' and Committee's attorneys, financial advisors, accountants, investment bankers, and any other professionals retained by them.

"Professional Excess Sale Proceeds" shall mean forty-five percent (45%) of the Net Sale Proceeds up to the amount of $225,000.

"Professional Fees" (whether or not capitalized throughout) shall refer to the fees and expense reimbursement sought by any given professional—without regard to whether the specific reference to fees also includes expense reimbursement.

"Professional Fee Order" means any Order of the Bankruptcy Court governing the allowance and payment of Allowed Professional fees.

"Proof of Claim" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

"Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion of a particular recovery that a Class is entitled to share with other Classes entitled to the same recovery under the Plan, as applicable.

"Qualified Institutional Buyer" shall mean a "qualified institutional buyer," as such term is defined pursuant to Rule 144A promulgated pursuant to the Securities Act.

"Record Date" shall mean January 18, 2016.

"Rejection Damage Claims" means any Claim arising from, or relating to, the rejection of an Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code by any of the Debtors, as limited, in the case of a rejected Unexpired Lease, by section 502(b)(6) of the Bankruptcy Code.

"Related Persons" means, with respect to any person, such person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective members, partners, equity holders, officers, directors, employees, representatives, advisors, attorneys, auditors, agents and professionals, in each case acting in such capacity on or any time after the Petition Date, and any person claiming by or through any of them

"Released Parties" means the Debtor Releasees, and the Third Party Releasees.

"Remnant Assets" means any asset that is not otherwise included in the Sale Assets or otherwise transferred through the Sale Process, and which are not included in the Free and Clear Assets.

"Representatives" means, with regard to an Entity, current and former officers, directors, members (including ex officio members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants, agents and other representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such).

"Retained Professional" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"Sale" means the sale of the Debtors' Sale Assets that will occur in accordance with the bidding procedures approved by the Bankruptcy Court.

"Sale Assets" means substantially all of the Debtors' assets that are to be sold pursuant to an order of the Bankruptcy Court approving the Sale Motion pursuant to 11 U.S.C. § 363.

"Sale Motion" means the motion seeking approval of the auction and sale of the Sale Assets [Docket No. _____].

"SBG Note" means that certain note issued by the Debtors to SB&G Properties, LC.

"Scheduled" means with respect to any Claim, the status and amount, if any, of such Claim as set forth in the Schedules.

"Schedules" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

"Secured Claim" means any Claim against any Debtor that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.  For the avoidance of doubt, on the Effective Date, the LSA Claims will be deemed Secured Claims solely with regard to the specific collateral set forth in the Final DIP Order and the PrePetition Credit Facility.

"Secured Tax Claim" means any Secured Claim which, absent its secured status, would be entitled to payment as a Priority Tax Claim.

"Securities" means any instruments that qualify under section 2(a)(1) of the Securities Act.

"Securities Act" means the Securities Act of 1933, 15 U.S. C. §§ 77a-77aa, as now in effect or hereafter amended, or any similar federal, state or local law.

"Servicer" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

"Solicitation Commencement Date" means the date that the Debtors and Committee shall commence service of the Solicitation Package.

"Solicitation Package" means the Combined Hearing Notice and, for those entitled to vote, a Ballot.

"Subordinated Claim" means any Claim against a Debtor, whether secured or unsecured, for any fine, penalty, forfeiture, attorneys' fees (to the extent that such attorneys' fees are punitive in nature), multiple, exemplary or punitive damages, or for any other amount that does not represent compensation for actual pecuniary loss suffered by the holder of such Claim, all claims against any of the Debtors of the type described in section 510(b) of the Bankruptcy Code, and any Claim that is equitably subordinated to all general unsecured Claims pursuant to section 510(c) of the Bankruptcy Code or otherwise.

"Third Party Releasees" means the Committee Releasees, the PrePetition LSA Releasees; DIP Lender Releasees.

"Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Liquidating Trust of an intent to accept a particular distribution; (c) responded to the Debtors' or Liquidating Trust requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

"Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code with a counterparty other than another Debtor.

"Unimpaired" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"Voting Deadline" means 12:00 p.m., prevailing Eastern Time, on March 2, 2016.

## ARTICLE II.
## INTRODUCTION

The Debtors and the Committee hereby propose the Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code.  The Debtors and the Committee are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

The Plan constitutes a liquidating chapter 11 Plan for the Debtors.  Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on or as soon as practicable after the Effective Date and at various intervals thereafter by the Liquidating Trust.  The Debtors will be dissolved under applicable law as soon as practicable upon the closing of the Chapter 11 Cases and the Debtors' Assets will be transferred to the Liquidation Trust, subject to the terms and provisions of this Plan.

The Plan incorporates the PrePetition Lender/Committee Settlement, which is an integral part of this Plan, and without this Settlement, the Committee would not be willing to: (i) act as a co-proponent of this Plan; or (ii) facilitate the Sale of the Debtors' Assets as contemplated by this Plan.   The terms and conditions of the PrePetition Lender/Committee Settlement are incorporated in this Plan and are conditioned upon the entry of the Confirmation Order and the occurrence of the Effective Date.  This Settlement, and the terms of this Plan, represent the best opportunity for unsecured claimants to receive any distribution in these cases.  For these reasons, the Official Committee of Unsecured Creditors recommends that all unsecured creditors entitled to vote on the Plan vote to approve this Plan.

The Debtors and their Professionals have actively negotiated all aspects of this Plan, and participated in the negotiation of the PrePetition Lender/Committee Settlement.  The Plan incorporates the consensual waiver, by the Debtors' Professionals of fees and expenses that are in excess of the cap set forth in the Budget, and otherwise in excess of the Professional Excess Sale Proceeds.  This consensual waiver of fees may impart a significant value upon the Estates and the Liquidating Trust formed pursuant to this Plan, and this waiver is incorporated in, and an integral component of, this Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVII(C) of the Plan, the Plan proponents expressly reserve the right to alter, amend or modify the Plan, one or more times, before its substantial consummation.

The factual assertions set forth in the following subsections are made by the Debtors only.

A.    DEBTORS' BUSINESS AND INDUSTRY

1.    The Company

Boomerang was engaged in the business of marketing, designing, engineering, manufacturing, installing and servicing its RoboticValet® automated parking systems, or APSs, with corporate and sales offices in Florham Park, New Jersey, and a research, design, engineering, production and testing center in Logan, Utah. Boomerang entered the business of APSs by developing and marketing automated self-storage systems to provide the space efficiency, security, and convenience of 100% "drive-up accessible" vertical self-storage in densely-populated urban locations with high real estate values. This system, referred to as Boomerang's Automated Locker Retrieval System or ALRS, stores steel storage containers in a steel rack system with a central open atrium and shuttles that move along a rail (i.e., "rack & rail") transporting containers back and forth between storage locations and ground floor loading bays.

During 2013, Boomerang ceased pursuing its ALRS and legacy rack-and-rail based APS in order to focus its resources and efforts on the next-generation RoboticValet® system in the U.S. and Canada.

Boomerang filed patent applications with respect to key aspects of its automated parking and self-storage systems. To date, the Debtors were awarded five (5) patents on a variety of automated self-storage system and components related to its RoboticValet and AGV systems. In addition, the Debtors have numerous domestic and international patent applications pending worldwide. In addition, Boomerang has the rights to various trademarks, trade names or service marks used in its business, including RoboticValet® and TrafficMaster®.

2.    Organizational Structure – Substantive Consolidation

Boomerang is the direct parent company and 100% owner of its debtor subsidiaries Boomerang Sub. Inc. ("Boomerang Sub"), Boomerang USA Corp. ("Boomerang USA"), and Boomerang MP Holdings, Inc. ("Boomerang MP").

Boomerang Sub was the operating business of Boomerang. These two Debtors were integrated businesses with common management, which shared key financial and operational systems. Boomerang USA and Boomerang MP are inactive legacy entities that were used to facilitate certain joint ventures. They are now defunct and have only minor tax losses to be carried forward.

Under applicable Third Circuit law, substantive consolidation is appropriate if "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005), *as amended* (Aug. 23, 2005), *as amended* (Sept. 2, 2005), *as amended* (Oct. 12, 2005), *as amended* (Nov. 1, 2007). Given the inextricable relationship between Boomerang Systems and Boomerang Sub, and the defunct status of Boomerang USA and Boomerang MP, substantive consolidation of the Debtors' Estates is appropriate in this case. As described more completely in Article IX(b) of this Plan, such substantive consolidation is solely for purposes of the Plan, including voting on the Plan by Holders of Claims, making distributions to Holders of Claims in such Class under the Plan and Confirmation.

Boomerang's Board of Directors is comprised of the following individuals: Mark Patterson (Chairman), James Gelly (Chief Executive Officer and Director), Chris Mulvihill (President and Director), Joseph Bellantoni (Director), Maureen Cowell (Secretary and Director), Anthony Miele (Director), David Koffman (Director), and Kevin Cassidy (Director).

Boomerang's corporate headquarters were in Florham Park, New Jersey. Boomerang also had a demonstration center in Hamburg, New Jersey, a design and engineering center in engineering center in Logan, Utah, and research, design, testing, and manufacturing, facilities in Fort Pierce, Florida.

Boomerang Systems is a publically held Delaware corporation that is traded over the counter under the ticker symbol BMER. As of the Petition Date, Boomerang Systems had approximately 18.2 million shares of its common stock outstanding.

3.    Employees

As of the Petition Date, Boomerang had 36 full-time employees, none of which are unionized. In the past, the Debtors also retained the services of independent contractors and part-time employees. As of the Petition Date, the Debtors did not have any independent contractors or part-time employees.

Boomerang's average, aggregate, bi-weekly, gross payroll, including wages and salaries and certain withholding obligations, was approximately $130,00.00 dollars (although there may be fluctuations, for example, during holiday periods). Employees were paid in arrears, on a bi-weekly basis, typically every other Friday, with direct deposits or checks issued on the Friday after the close of each pay period. Boomerang's last payroll prior to the Petition Date was made on August 7, 2015, covering wages and salaries earned from July 18, 2015 through July 31, 2015.

All employees were terminated effective December 4, 2015 except for James Gelly, Rod Kirby and Ryan Campbell who will participate in the sales process. Mark Patterson also remains with Boomerang as a member of the Debtors' board of directors.

B.    DEBTORS' CORPORATE AND CAPITAL STRUCTURE

1.    General Corporate Structure

Boomerang is the parent corporation of Boomerang Sub, Boomerang USA, and Boomerang MP.

## ARTICLE III.
## SUMMARY OF PREPETITION INDEBTEDNESS AND PREPETITION FINANCING

A.    Secured Debt

1.    The Loan and Security Agreement

On June 11, 2013, Boomerang and its wholly-owned subsidiary debtors Boomerang Sub, Boomerang USA, and Boomerang MP (collectively, the "Debtors"), entered into the Loan and Security Agreement with certain lenders party thereto (together with any party which subsequently became a lender party thereto, the "Lenders") and Parking Source LLC, as agent for itself and the other Lenders (the "Agent").  Pursuant to the Loan and Security Agreement, the Lenders committed to fund $4,750,000 principal amount of loans to the Debtors.  The Loan and Security Agreement and contemplated that the aggregate principal amount of borrowings may be increased to $10,000,000 through commitments from additional, subsequent Lenders.

On July 12, 2013 and August 6, 2013, the Debtors entered into Amendments No. 1 and No. 2 to the Loan and Security Agreement by which the additional Lenders committed to fund an additional $3,100,000 principal amount of loans to the Debtors (bringing aggregate commitments under the Loan and Security Agreement to $7,850,000).  On December 24, 2014, the Debtors entered into Amendment No. 3 to the Loan and Security Agreement by which the existing Lenders and incremental Lenders committed to fund an additional $7,050,000 principal amount of loans to the Debtors, bringing aggregate commitments under the Loan and Security Agreement to $14,900,000.  Amendment No. 4 to the Loan and Security Agreement, dated as of April 1, 2015, increased the commitments under the Loan and Security Agreement to $14,950,000.

As partial consideration for providing advances under the Loan and Security Agreement, Boomerang agreed to issue to each Lender warrants to purchase 20,000 shares of its common stock for each $100,000 advanced.  The warrants are exercisable at $5.00 per share, subject to full-ratchet adjustment for issuance below the exercise price, subject to certain exceptions.  The exercise price was subsequently adjusted to $2.15, and the number of warrants issuable was adjusted to 46,512 for each $100,000 advanced.  The warrants expire on June 6, 2018.

The obligations under the Loan and Security Agreement are allegedly secured by a first priority lien in all tangible and intangible assets of Boomerang.  The Loan and Security Agreement matures on May 31, 2016.  As of the Petition Date, the total amount outstanding under the Loan and Security Agreement was approximately 13,350,000, plus accrued interest of approximately $2,270,417.

B.    February 2008 Loan

Effective February 6, 2008, Boomerang became indebted for an unsecured loan to a third party (the "February 2008 Loan"). As of March 31, 2015, the principal balance of this loan was $80,538. The February 2008 Loan is not collateralized, bears interest at an annual rate of 10%, and is due on demand. As of the Petition Date, the total amount outstanding on the February 2008 Loan was approximately $128,260.

C.    2011 Notes

In November and December 2011, Boomerang issued 6% convertible promissory notes in the aggregate principal amount of approximately $11.6 million ("2011 Notes"). The 2011 Notes are due five years after the respective date of issuance and were initially convertible into common stock at $4.25 per share, subject to weighted average adjustment for issuances of common stock or common stock equivalents below the conversion price, subject to certain exceptions.

D.    June 2012 Notes

In June and July 2012, Boomerang issued 6% convertible promissory notes due or June 14, 2017 in the aggregate principal amount of $6.2 million (the "June 2012 Notes"). The 2012 Notes were initially convertible into common stock at $5.00 per share, subject to weighted average adjustment for issuances of common stock or common stock equivalents below the conversion price, subject to certain exceptions.

E.    December 2012 Notes

In December 2012 and March 2013, Boomerang issued to subscribers 6% convertible notes due on December 28, 2017 in the aggregate principal amount of approximately $3.1 million (the "December 2012 Notes").  The December 2012 Notes were initially convertible into common stock at $5.00 per share, subject to full ratchet anti-dilution adjustment for issuances of common stock or common stock equivalents below the conversion price, subject to certain exceptions, and subject to weighted average anti-dilution adjustment for issuances of common stock as payment of interest on the Notes, the June 2012 Notes, and the December 2012 Notes. The entire principal amount of the December 2012 Notes, plus accrued and unpaid interest on October 31, 2014, was exchanged as part of the exchange offer on October 31, 2014 (described below).

F.    Exchange Offer of Certain Notes

On October 31, 2014, Boomerang completed an offer to exchange outstanding convertible notes and warrants, for the issuance of common stock at the rate of $2.15 per share in exchange for the entire balance (principal and interest) of the notes and warrants issued with the applicable note. Boomerang exchanged $20.5 million principal amount of the previously outstanding $20.9 million of convertible notes and 4,859,409 warrants for 9,583,384 shares of common stock in the exchange offer (the "Exchange Offer").  Following the Exchange Offer, $200,000 of the principal amount of the 2011 Notes and $200,000 of the principal amount of the 2012 Notes remained outstanding, at conversion ratios of $3.00 and $3.31 per share, respectively.

17

G.    SB&G Note

In March 2015, Boomerang and SB&G Properties, LC restructured $573,982 due to a related party for deferred rent through the issuance of a promissory note in the amount of $500,000. The note accrues interest at a rate of 4% annually on the outstanding principal with all accrued principal and interest due on or before February 28, 2020.

H.    Trade Debt

As a seller, designer, manufacturer, and servicer of automated parking systems, Boomerang has over 150 vendors.  Boomerang does not generally have long-term supply agreements with its major vendors, which provides Boomerang the flexibility it requires due to the highly individualized nature of its customer agreements.  As of the Petition Date., Boomerang estimates that it has approximately $5.6 million of unsecured trade debt and other outstanding operating expenses including liabilities to certain of their landlords.

I.    Events That Led Boomerang to Commence these Chapter 11 Cases

1.    Boomerang's Recent Performance: Revenues Rise, But Losses Continue

Although there are significant benefits to Boomerang's innovative automated parking systems, its products are still very new to the market.  Its RoboticValet® system is the only one like it in the world.  As such, Boomerang has spent a significant amount developing and testing the products and educating their potential customers on their benefits.

But, despite its marketing and sales efforts, as of the Petition Date, Boomerang had only entered into four commercial contracts for the RoboticValet®.

As a result of these and other factors, despite Boomerang's increasing revenues, Boomerang has not yet turned a profit.  The chart below shows Boomerang's financial performance since it entered the automated parking systems industry:

| Summary of Results of Operations from Consolidated Financial Statements | | | | | | |
|---|---|---|---|---|---|---|
| (Approximately Dollars in Millions) | | | | | | |
| Fiscal Year | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Total Revenue | 0.72 | 1.59 | 1.15 | 2.72 | 5.45 | 2.35 |
| Operating Loss | (15.51) | (15.08) | (12.24) | (7.72) | (7.75) | (4.82) |
| Net Loss | (15.79) | (19.10) | (17.42) | (11.22) | (2.67) | (15.17) |

2.    Arbitration Award for Breach of Contract

18

In April 2015, an arbitration award was issued wherein Boomerang was ordered to pay approximately $1.5 million for a rack-and-rail system that Boomerang had manufactured and installed in Florida.

More specifically, on March 15, 2013, Crescent Heights R&D, LLC ("Crescent Heights"), filed a complaint against Boomerang in the state of Florida for fraud, breach of contract, specific performance, and equitable rescission which alleged an unspecified amount of damages in excess of the purchase price arising from a contract to provide a rack-and-rail automated parking system.  Boomerang subsequently successfully removed the matter to federal court, and, on May 17, 2013, the court granted Boomerang's motion to compel arbitration.  By agreement of the parties, an arbitration hearing took place in front of the American Arbitration Association in November 2014.

On April 21, 2015, the arbitrator issued a final arbitration award denying Crescent Heights' claims of fraud in the inducement, equitable rescission based on fraud, and declaratory relief to strike the limitation of liability clause, but found Boomerang in breach of contract.  Crescent Heights was awarded damages of $1,197,890, plus attorneys' fees and costs of $319,920, which Boomerang is required to pay in fiscal year 2015.  As of the Petition Date, Boomerang had paid approximately $1.3 million of the total award.

The Debtors believe that some or all of the payments made to Crescent Heights may be subject to avoidance under chapter 5 of the Bankruptcy Code.

> 3.  Secured Lender Defaults Extinguishing Any Possibility of Securing Additional Funding

To date, Boomerang has relied on the debt and equity markets to fund their operations until it can sustain its operations with its existing contracts.  But recent events, caused by Parking Source's default of its obligations under the Loan and Security Agreement, discussed below, have extinguished Boomerang's ability to finance its operations without filing for chapter 11.

In or around April 2015, Boomerang began requesting that Parking Source fund its remaining $1.6 million obligation under the Third Amendment to the Loan arid Security Agreement.  Boomerang repeated its request on numerous occasions between April and July 2015.  Boomerang's requests were always met by Parking Source's reluctance to fund.

In or around July 16, 2015, Parking Source, through its member manager Mr. Hernandez, informed Boomerang that Parking Source would not fund the $1.6 million.  In fact, Mr. Hernandez expressly stated that he and Mr. Quintero, Parking Source's only members, knew that its decision to default could lead to Boomerang's bankruptcy and that Parking Source could then arrange for another garage to take the cars currently being parked at the BrickellHouse Project when Boomerang declared bankruptcy.

Mr. Hernandez was correct.  Without the $1.6 million, Boomerang was not able to make more than a few additional payrolls. Indeed, Boomerang was relying on that $1.6 million to cover its operating expenses until late in 2015, when Boomerang anticipated that it would have up to an additional $15 million in financing provided by an equity offering to new investors.

In or around March 2015, Boomerang began preparing an equity offering that would have secured $15 million in additional liquidity for Debtors.  Further, Boomerang had commenced a tender offer, converting secured notes for new common shares, which would have relieved Boomerang of substantially all of its outstanding secured debt and vastly improve its capital structure.

By the end of July 2015, it appeared that Boomerang would be successful in its equity offering if it could continue to operate until at least mid-September 2015, when the tender offer and equity offering were expected to be completed.  At or around this time, however, Parking Source defaulted on its obligations to provide the $1.6 million.  Parking Source's default created a cash crunch and caused Boomerang to focus its efforts on funding alternatives and contingency planning.

The dominos sent tumbling by Parking Source's default under the Loan and Security Agreement forced Boomerang and its affiliated debtors to file these chapter 11 cases in order to restructure and reorganize its business, as discussed below.

Law Debenture Trust Company of New York was appointed as PrePetition Administrative Agent, replacing Parking Source, by a letter agreement dated August 16, 2015, among Law Debenture Trust Company of New York, the Debtors and the requisite majority of PrePetition LSA Lenders.

J.     ADMINISTRATION OF THE CHAPTER 11 CASES

1.     Debtor in Possession Financing

Realizing that an infusion of new money into the Debtors would protect the Debtors' liquidity during the Chapter 11 cases, the Debtors filed a motion to approve a debtor in possession credit facility with Game Over Technology Investors, LLC, as agent for itself and other lenders, for up to $3 million (the "DIP Facility") [Docket No. 9].  This motion also included a request for entry of an interim order authorizing the Debtors to use the Prepetition Credit Agreement Lenders' cash collateral and, subject to the first and prior lien and super priority administrative claim of the DIP Lender granting adequate protection to the Prepetition Credit Agreement Lenders, and for entry of a final order authorizing and approving the DIP Facility.

Thereafter, on October 2, 2015, the Court entered a final order [Docket No. 200] (the "Final DIP Order") granting the Debtors the authority to, among other things, use cash collateral, protect prepetition secured parties, modify the automatic stay, obtain postpetition financing, and grant liens.

Ultimately, for a variety of reasons, only $1 million of the DIP Facility was funded. Thereafter, the Debtors elected to pursue a plan of liquidation which contemplates the sale of substantially all the Debtors' business assets.  To fund the liquidation and provide the Debtors with the ability to conduct an orderly sale process, the DIP Lenders agreed to advance an additional $750,000 to the Debtors to be used for certain fees and expenses and other costs, as well as to fund the Debtors' obligation to pay the DIP Lenders' expenses under the DIP Facility.

K.      FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, customers, employees, landlords and utility providers that had been impacted by the commencement of these Chapter 11 Cases.  As a result of these initial efforts, the Debtors mitigated the negative impacts resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of first day motions and applications (collectively, the "First Day Motions") with the Bankruptcy Court.  Within a few days, the Bankruptcy Court entered several orders to, among other things: (1) prevent interruptions to the Debtors' businesses; (2) ease the strain on the Debtors' relationships with certain essential constituents; (3) provide access to much needed working capital; and (4) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases (each, a "First Day Order").

1.      Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Bankruptcy Court entered the following procedural Orders: (a) Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only [Docket No. 35]; (b) Order Granting Motion of the Debtors for an Order (I) Extending the Time Within Which the Debtors Must File Their (A) Schedules and Statements of Financial Affairs and (B) Rule 2015.3 Financial Reports and (II) Waiving the Requirement to File the List of Equity Security Holders. [Docket No. 41]; and (c) Order Scheduling Omnibus Hearings [Docket No. 62].  On October 5, 2015, the Debtors filed their Schedules and Statements of Financial Affairs [Docket Nos. 204-207].

2.      Employment and Compensation of Advisors

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders, authorizing the Debtors to retain and employ the following advisors: (i) Order Authorizing Retention and Appointment of Garden City Group, LLC as Claims and Noticing Agent [Docket No. 36]; (ii) Order Authorizing Employment And Retention Of Blank Rome LLP As Special Securities And Corporate Counsel To The Debtor Nunc Pro Tunc To August 18, 2015 [Docket No. 167]; (iii) Order Authorizing Employment And Retention Of Berg & Androphy As Special Litigation Counsel To The Debtors, Nunc Pro Tunc To August 18, 2015 [Docket No. 168]; (iv) Order Authorizing The Employment And Retention Of Ciardi Ciardi & Astin As Delaware Counsel To The Debtors And Debtors In Possession Nunc Pro Tunc To The Petition Date [Docket No. 169]; (v) Order Authorizing Employment And Retention Of Gavin/Solmonese LLC Nunc Pro Tunc To September 8, 2015 As Financial Advisor To The Official Committee Of Unsecured Creditors [Docket No. 234]; (vi) Order Authorizing The Employment And Retention Of A.M. Saccullo Legal, LLC As Counsel For The Official Committee Of Unsecured Creditors [Docket No. 235]; and (vii) Order Authorizing (I) The Employment And Retention Of Togut, Segal & Segal LLP As Counsel To The Debtors Nunc Pro

Tunc To The Petition Date Through September 13, 2015 And (II) The Employment And Retention Of Sullivan & Worcester LLP As Counsel To The Debtors As Of September 14, 2015 [Docket No. 242]. On October 16, 2015, the Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of Retained Professionals in the Chapter 11 Cases [Docket No. 244].

### 3.    Stabilizing Operations

Recognizing that any interruption of the Debtors' business, even for a brief period, would negatively impact customer and supplier relationships, revenue and profits, the Debtors filed a number of First Day Motions to ensure the stabilization of the Debtors' operations while in Chapter 11. Thereafter, the Bankruptcy Court entered a number of First Day Orders granting the Debtors the authority to, among other things, pay certain prepetition claims and obligations and continue certain existing programs. The relief granted by the First Day Orders helped facilitate the Debtors' smooth transition into Chapter 11, allowed the Debtors to continue their operations without interruption and prevented a decrease in confidence among suppliers, customers and creditors as to the likelihood of the Debtors' successful emergence from the Chapter 11 Cases.

### 4.    Cash Management Motion [Docket No. 4]

To prevent disruption to the Debtors' business, the Debtors filed a First Day Motion to continue using Boomerang's existing cash management system, bank accounts and business forms. Additionally, the Debtors sought authority to maintain and continue using their existing bank accounts in the same manner as before the Petition Date without reference to their status as debtors-in-possession.

The Bankruptcy Court entered a First Day Order [Docket No. 38] and then, on September 9, 2015, a Final Order [Docket No. 103] authorizing, among other things, the Debtors to maintain certain existing bank accounts, continue to use existing checks and business forms, and continue to use the existing cash management system.

### 5.    Tax Motion [Docket No. 5]

The Debtors believed that, in some cases, certain authorities had the ability to exercise rights that would be detrimental to the Debtors' restructuring if the Debtors failed to meet the obligations imposed upon them to remit certain taxes. Accordingly, the Debtors sought an order authorizing the Debtors to pay any fees and taxes to avoid harm to the Debtors' business operations.

The Bankruptcy Court entered a Final Order authorizing the Debtors to pay prepetition taxes [Docket No. 39].

### 6.    Wages Motion [Docket No. 6]

The Debtors rely on their employees for their day-to-day business operations. The Debtors believed that absent the ability to (i) pay prepetition claims for compensation, benefits, and reimbursement of expenses and (ii) continue employee programs in the ordinary course of business and consistent with past practices, their employees might have sought alternative

employment opportunities, perhaps with the Debtors' competitors, thereby depleting the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations and likely diminishing customer confidence in the Debtors.  The loss of valuable employees would have been distracting and destabilizing at a critical time when the Debtors were focused on stabilizing their operations.

The Bankruptcy Court entered a First Day Order [Docket No. 37] and then, on September 9, 2015, a Final Order [Docket No. 104] authorizing the Debtors to pay, among other amounts, prepetition claims and to pay and continue obligations for (1) compensation and reimbursable employee expenses, (2) deductions and payroll taxes and (3) employee medical and similar benefits.  Such First Day Order and Final Order also directed banks and financial institutions to honor all checks and electronic payment requests made by the Debtors related to such prepetition compensation.

7.      Insurance Motion [Docket No. 8]

The Debtors felt that the maintenance of and entry into future insurance policies was critical to the preservation of the value of the Debtors' Estates, and that payment of certain unpaid prepetition amounts relating to their insurance policies was necessary to allow the Debtors to keep their insurance policies in effect and ensure that there were no inadvertent lapses in coverage.  Accordingly, the Debtors filed a First Day Motion seeking authority to continue insurance and pay prepetition premiums and brokers' fees necessary to maintain insurance coverage.

On August 20, 2015, the Bankruptcy Court entered a First Day Order [Docket No. 42] and then, on September 9, 2015, a Final Order [Docket No. 106] authorizing the Debtors to continue insurance and pay prepetition premiums and brokers' fees necessary to maintain insurance coverage.

8.      Utilities Motion [Docket No. 7]

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services.  The Debtors believed that the financing provided by the DIP Facility, along with the Debtors' incentive to maintain their utility services, provided their utility providers with the adequate assurance required by the Bankruptcy Code.  Consequently, the Debtors filed a Motion approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.

On August 20, 2015, the Bankruptcy Court entered a First Day Order [Docket No. 40] and then, on September 9, 2015, a Final Order [Docket No. 105] granting such relief.

9.      Motion to Approve Rejection of Certain Executory Contracts [Docket No. 88]

On August 20, 2015, the Debtors filed a motion pursuant to section 365 and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure authorizing the Debtors to reject certain

executory contracts effective nunc pro tunc to the Petition Date [Docket No. 31].   The Bankruptcy Court entered Orders approving this motion with respect to certain contracts on September 28, 2015 and October 2, 2015 [Docket Nos. 181, 193 & 194].

L.   MOTION TO CONVERT OR APPOINT CHAPTER 11 TRUSTEE

On September 14, 2015, Campus Acquisitions 308 Green, LLC and HERE Lawrence Property Owner, LLC ("Campus Acquisitions") filed a Motion to (I) To Convert the Debtors' Cases to Chapter 7 Or, In the Alternative, (II) To Appoint a Chapter 11 Trustee (the "Motion to Convert") [Docket No. 112].   On September 21, 2015, Boomerang filed an objection to this motion [Docket No. 154].   The Debtors and DIP Lenders timely responded to the discovery requests submitted by Campus Acquisitions, incurring substantial unexpected expenses in the process.

On September 24, 2015, Campus Acquisitions notified the Bankruptcy Court that it was going to withdraw the Motion to Convert.   On October 2, 2015, and order to withdraw the Motion to Convert was approved with prejudice by the Court [Docket No. 194].

M.   EXCLUSIVITY

Under the Bankruptcy Code, a debtor has the exclusive right to file a Plan or Plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (which may be extended by the Court for a period of up to 18 months from the petition date).   If a debtor files a Plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the Plan (which may be extended by the Court for a period of up to 20 months from the petition date).   During the Debtors' exclusive periods, no other party in interest may file a competing Plan of reorganization, however, a court may terminate the Debtors' exclusive periods upon request of a party in interest and "for cause."   By order of the Bankruptcy Court dated January 19, 2016 [Docket No. 370], the plan period and the solicitation period were each extend by 120 days, respectively, through and including April 14, 2016, and June 13, 2016.   The Debtors filed the Plan within this extended exclusivity period.

N.   COMMITTEE

1.   Appointment of Committee

On September 2, 2015, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") [Docket No. 72].   On September 3, 2015 and November 18, 2015, the United States Trustee filed amended notices of appointment [Docket Nos. 80 and 286, respectively]. Currently, the members of the Committee are as follows: (a) AV Excellence, LLC; (b) Xaplos, Inc.; and (c) Quay Consulting.   To assist the Committee in carrying out its duties, the Committee selected A. M. Saccullo Legal, LLC as its counsel.   Further, the Committee selected Gavin/Solmonese LLC as its financial advisor.   The Court entered Orders retaining both firms on October 15, 2015 [Docket Nos. 234 and 235].

2.   Section 341(a) Meeting of Creditors

24

On September 25, 2015, the United States Trustee presided over the section 341(a) meeting of creditors in the Chapter 11 Cases. That day, the United States Trustee filed a request to continue the section 341 meeting of creditors until October 9, 2015. On October 9, 2015, the United States Trustee again requested that the meeting be continued until October 27, 2015. On October 26, 2015, the United States Trustee filed a minute sheet indicating that the meeting would not be held on October 27, 2015, and that the meeting would be continued. The 341 meeting has been adjourned to February 4, 2016.

3.      Schedules and Statements and Bar Date

The Debtors filed with the Bankruptcy Court their Schedules on September 18, 2015 [Docket Nos. 133-140]. The Debtors filed Amended Schedules on October 5, 2015 [Docket Nos. 204-207], yet withdrew these immediately and refiled Amended Schedules on October 6, 2015 [Docket Nos. 213-216]. On October 7, 2015, Boomerang MP Holdings Inc. filed a Second Amended Summary of Schedules [Docket No. 223]. On November 10, 2015, Boomerang filed a Second Amended Schedule G, an Amended Schedule F, and a Second Amended Statement of Financial Affairs [Docket No. 267-268] The Schedules and Statements have been subsequently amended, as reflected on the docket of these Bankruptcy Cases.

On September 22, 2015, the Debtors filed the Debtors' Motion for an Order Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof [Docket No. 166], seeking entry of an Order establishing the General Bar Date, the Governmental Unit Bar Date and the Rejection Bar Date. The Bankruptcy Court entered the Bar Date Order, which granted the relief requested in the motion, on October 16, 2015 [Docket No. 243].

O.      LITIGATION CLAIMS

The Debtors have reviewed certain potential actions they hold against JBT, Crescent Heights, Parking Source, LLC and Park Plus. The Debtors Plan on using these actions to help fund unsecured creditor recoveries. Specifically, the Debtors believe they have preference actions against both JBT and Crescent Heights. The Debtors expect that the Liquidating Trust to bring these actions shortly after the Effective Date and will use these funds to satisfy unsecured claims. While the Debtors believe the claims against these preference recipients are strong, the Debtors cannot guarantee recovery.

The Debtors also hold strong claims against JBT for its failure to provide properly functioning software. The Debtors expect the Liquidating Trust to bring these claims against JBT post Effective Date as well.

As stated above, the Debtors also hold claims against Parking Source LLC and Park Plus. These actions are described in Article III(I)(3). While the Debtors believe the claims against these defendants are strong, the Debtors cannot guarantee recovery.

P.      SALE AND LIQUIDATION

On October 2, 2015, after a contested hearing, this Court entered a final order granting the Debtors the ability to obtain an additional $2 million in debtor in possession financing

25

[Docket No. 200] (the "Final DIP Order").  The Final DIP Order was the subject of lengthy and extensive negotiations between the DIP Agent, the Debtors and the Committee.  At the time of the entry of the Final DIP Order it was the parties' desire that the Debtors would pursue the negotiation of a viable business plan and thereafter seek confirmation of a plan of reorganization and exit chapter 11 as a reorganized and restructured company.

After this Court's approval of the Final DIP Order, the Debtors and the DIP Agent attempted to negotiate the form of final credit agreement.  These negotiations were extensive, and there were significant differences of opinion as to certain provisions contained in the draft credit agreement and over the terms and viability of the Debtors' business plan and the budget necessary to implement such a plan.  Ultimately, it became apparent that no agreement could be reached between the parties.  As the Debtors apprised this Court on November 19, 2015, the Debtors were unable to finalize and execute the DIP Credit Agreement with DIP Agent, and ultimately, the Debtors determined that a liquidation of their assets and a chapter 11 plan of liquidation was the best option available to maximize value to all parties in interest in these cases.

Faced with an inability to reorganize, the Debtors sought to negotiate funding from DIP Agent —and concomitant reduction in Professional fees—to ensure that these Estates were administratively solvent through the liquidation process.  These negotiations were also extensive, and there were significant differences with regard to the funding needed to support a liquidation.  These negotiations were unsuccessful, and it appeared that sufficient funding to support an orderly liquidation and chapter 11 plan process would not be forthcoming.

On December 4, 2015, DIP Agent reached an understanding with certain of the Debtors' insiders—including their Chief Executive Officer and Board Chairman—pursuant to which the insiders would provide $200,000 of the requisite $750,000 in DIP funding needed to support a liquidating plan process pursuant to the Professional fee concessions negotiated by the Debtors' counsel and that GOTI would fund the remaining $550,000 of the $750,000.

On December 21, 2015, this Court approved a First Amendment to the DIP Loan Agreement that provides for the funding of $750,000 by GOTI with the participation of certain of the Debtors' insiders.  The $750,000 has been funded as contemplated by the First Amendment to the DIP Loan Agreement.  As a result of the participation in the DIP Financing by the Debtors' insiders, the Debtors, GOTI, and the Committee have agreed that the Committee and its professionals will conduct the marketing and sale process for the Debtors' assets.  Messrs. Patterson and Gelly, along with two other knowledgeable employees, will remain with the Debtors throughout the sale and plan confirmation process, and assist the Committee and its professionals in the marketing and sale process.  The Committee and its professionals will be vested—through the Order approving the Bid Procedures contemplated in this Motion—with the authority to control the sale process, including the determination of: (i) which bids and bidders are qualified to participate in the auction process; (ii) which bid is used to commence the auction process; and (iii) which bid is the highest and best offer to be submitted to the Court for approval.

On January 20, 2016, the Debtors and Committee filed the Sale Motion seeking approval of bidding procedures in connection with the sale of the Sale Assets and approval of the Sale.

The Debtors and Committee will seek approval of the Sale approximately two weeks after the Confirmation Hearing.

Q.   OPERATIONS OF THE DEBTORS BETWEEN THE CONFIRMATION DATE AND EFFECTIVE DATE

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date, and as a liquidating estate on and after the Effective Date. The retention and employment of the Professionals retained by the Debtors shall terminate as of the Effective Date, provided, however, that the Debtors shall be deemed to exist, and their Professionals shall be retained, after such date only with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, and to the extent necessary (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order. Upon the Effective Date, the Debtors' board of directors shall be relieved of its duties and the Debtors shall be dissolved.

**ARTICLE IV.**
**SOLICITATION, VOTING AND CONFIRMATION PROCEDURES**

A.   SOLICITATION PROCEDURES

**1.**   Notice, Claims and Solicitation Agent

The Debtors have retained Garden City Group, LLC ("GCG") to, among other things, act as solicitation agent in connection with the solicitation of votes to accept or reject the Plan and the solicitation of votes of Holders of Claims (the "Notice, Claims and Solicitation Agent").

**2.**   Solicitation Package

The Solicitation Package shall contain copies of the following:

(i) the Combined Hearing Notice; and

(ii) a Ballot (for those entitled to vote)

**3.**   Distribution of the Solicitation Package

In accordance with Bankruptcy Rule 3017(d), the Debtors propose that, on the Solicitation Commencement Date, the Debtors and Committee shall serve the Combined Hearing Notice on all creditors and equity interest owners.  In addition, the Debtors and Committee will serve all Holders of Claims in any Voting Class with the Solicitation Package, which includes (i) the Combined Hearing Notice and (ii) a Ballot.  The Notice, Claims and Solicitation Agent will mail the Solicitation Package on the Solicitation Commencement Date to Holders of Claims in the Voting Class that are entitled to vote.

The Debtors submit that the foregoing procedures for providing notice of the Combined Hearing, the Confirmation Objection Deadline and related matters fully comply with

27

Bankruptcy Rules 2002 and 3017 and the time limits set forth therein, and are both fair to holders of claims and equity interests and other parties in interest and are calculated to result in votes and objections that will be known in sufficient time to permit an organized and efficient Combined Hearing.

The Notice, Claims and Solicitation Agent has posted the Plan and Conditional Approval and Procedures Order to the Debtors' dedicated restructuring website at www.gcginc.com/cases/bmr (the "Reorganization Website").

B.    VOTING PROCEDURES

The Bankruptcy Court approved the close of business on January 27, 2016 as the Voting Record Date.  The Voting Record Date is the date for determining (i) which Holders of Claims are entitled to vote to accept or reject the Plan and (ii) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim.  The Voting Record Date and the Debtors' and Committee's solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

The Bankruptcy Court approved March 2, 2016, at 4:00 p.m. prevailing Eastern Time, as the deadline (the "Voting Deadline") for the delivery of executed Ballots voting to accept or reject the Plan.  Under the Plan, Holders of Claims in Voting Classes are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot and delivering it to the Claims, Solicitation and Subscription Agent by the Voting Deadline.  Voting Instructions are attached to each Ballot.  To be counted as votes to accept or reject the Plan, all Ballots, must be properly executed, completed and delivered by:  (a) first class mail; (b) courier; or (c) personal delivery, so that they are actually received by the Notice, Claims and Solicitation Agent no later than the Voting Deadline.  It is important to follow the specific instructions provided on each Ballot.  Ballots should be sent as indicated in the chart below.

**BALLOTS**

**Ballots must be <u>actually received</u> by the Notice, Claims and Solicitation Agent by the Voting Deadline** by First Class Mail, Overnight Courier or Personal Delivery to:

| If by first class mail: | If by overnight courier or personal delivery: |
|---|---|
| Boomerang Balloting Center<br>c/o GCG<br>P.O. Box 9985<br>Dublin, OH 43017-5985 | Boomerang Balloting Center<br>c/o GCG<br>5151 Blazer Parkway<br>Suite A<br>Dublin, Ohio 43017 |

If you have any questions on the procedures for voting on the Plan, please call the Notice, Claims and Solicitation Agent at the following telephone number: (877) 940-9491.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS AND THE COMMITTEE AGREE TO THE LATE SUBMISSION OR THE BANKRUPTCY COURT DETERMINES OTHERWISE.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT, THE DEBTORS AND THE COMMITTEE THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.**

**IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT WHEN SUBMITTING A VOTE.**

C.    COMBINED HEARING

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan filed under chapter 11 of the Bankruptcy Code.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the plan.

The Combined Hearing will commence on **March 9, 2016, at 10:30 a.m. prevailing Eastern Time**, before the Honorable Mary F. Walrath, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 Market St., 5th Fl., Courtroom #4, Wilmington, Delaware 19801.  The Combined Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the master service list and the Entities who have filed Objections, without further notice to parties in interest; provided, however, that at the Debtors' discretion, such adjournment may be included in the Notice of Agenda filed with the Bankruptcy Court in conjunction with the Combined Hearing.  The Bankruptcy Court, in its discretion and prior to the Combined Hearing, may put in place additional procedures governing the Combined Hearing.  The Plan may be modified, if necessary, prior to, during or as a result of the Combined Hearing, without further notice to parties in interest.

The Objection Deadline is **March 2, 2016, at 4:00 p.m. prevailing Eastern Time**.  All Objections must be Filed with the Bankruptcy Court and served on the Debtors and Committee and certain other parties in interest in accordance with the Solicitation Procedures Order so that they are received on or before the Objection Deadline.  The Debtors and Committee believe that

the Objection Deadline will afford the Bankruptcy Court, the Debtors and other parties in interest reasonable time to consider the Objections prior to the Combined Hearing.

**THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS UNLESS THEY ARE TIMELY AND PROPERLY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER.**

D.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors and Committee believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith.  The Debtors and Committee believe that the Plan satisfies or will satisfy the applicable requirements for Confirmation.  Certain of the major requirements for Confirmation of a chapter 11 Plan are discussed below.

1.    Best Interests of Creditors Test - Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 Plan provides, with respect to each impaired class of claims and equity interests, that each holder of a claim or an equity interest in such class either (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

The Debtors and Committee with their advisors have reviewed the Claims against the Estates, potential Causes of Action and other sources of potential recovery and have determined that the Plan provides a greater recovery for creditors of the Debtors' Estates.

2.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of debtors, unless the Plan contemplates such liquidation.   The Plan is a liquidating plan that the Debtors and Committee believe meets the requirements of section 1129(a)(11).

3.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in Article IV.D.4 below, each class of claims or equity interests that is impaired under a Plan, accept the Plan.  A class that is not "impaired" under a Plan is deemed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such class is not required.  As a general matter under the Bankruptcy Code, a class is "impaired," unless the Plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a Plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan.  Thus, a class of claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Claims in Classes 1 and 2 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan.

Any Class of Claims that is not occupied as of the commencement of the Combined Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

The Voting Classes are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan in order for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan

31

"discriminates unfairly" with respect to such Classes, as both standards are described herein. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

4.       Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a Plan even if impaired classes entitled to vote on the Plan have not accepted it, provided, that, the Plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the Plan, such Plan will be confirmed, at the Plan proponent's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the Plan.

5.       No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a Plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a Plan discriminates unfairly. Certain bankruptcy courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes. Accordingly, a Plan could potentially treat two classes of unsecured creditors differently without unfairly discriminating against either class.

6.       Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting impaired class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in subclause (i) or (ii) of this subparagraph.

Unsecured Claims: Either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims or equity interests of the non-accepting class will not receive or retain any property under the Plan on account of such claims and equity interests.

Equity Interests: Either (i) each holder of an equity interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its equity interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the Plan on account of such equity interest.

The Debtors and Committee will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejections by Classes 6 and 7. The Debtors and Committee believe that the Plan may be confirmed on a nonconsensual basis (provided, that, at least one impaired Class of Claims votes to accept the Plan). To the extent that any of the Voting Classes vote to reject the Plan, the Debtors and Committee further reserve the right to seek (1) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (2) alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, subject in all respects to Article XVII.C of the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The votes of Holders of Class 6 Equity Interests in Boomerang Systems, Inc. and Class 7 Intercompany Claims are not being solicited because, under Article IV of the Plan, there will be no distribution to the Holders of these Interests. The members of Classes 6 and 7 have, therefore, conclusively been deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. All Class 6 Equity Interests will be deemed canceled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejections by Classes 6 and 7 or any Class that votes to reject the Plan, the Debtors believe that the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

E.      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the most likely scenario in the event the Plan is not confirmed will be the conversion to Chapter 7. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

1.      LIQUIDATION UNDER CHAPTER 7

If no Plan is confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in the Liquidation Analysis. For the reasons articulated in Article IV.D.1 above and in the Liquidation Analysis attached at

Exhibit B, the Debtors believe that liquidation under chapter 7 would result in lower aggregate distributions being made to Holders of Allowed Claims than those provided in the Plan.

The Committee and the Debtors believe that the maximum value for the Debtors' tangible and intangible assets can only be realized through an orderly liquidation in chapter 11, which features the support, knowledge, and participation of the Debtors' remaining officers, directors and management.  These individuals are intimately familiar with the Debtors' assets and the technology that those assets support, the industry in which the Debtors operated, and any potentially interested purchasers.  This knowledge is imperative to any potential purchaser who may be interested in attempting to operate the Debtors' former businesses.  Liquidation in chapter 7 may not afford the active participation and involvement of these parties, which has been negotiated by and between the Debtors and the Committee.

Furthermore, a liquidation in chapter 7 would not permit the unsecured creditors of these Estates to benefit from the PrePetition Lender/Committee Settlement, which provides unsecured creditors with significant sharing percentages in the proceeds derived from the liquidation and administration of the Debtors' assets.  Absent confirmation of this Plan, the terms and conditions of this carve out may not be available to unsecured creditors, who may be forced to either litigate against the LSA Lenders, or receive distribution only after the LSA Lender Claims are satisfied in full—an unlikely outcome in a forced liquidation in chapter 7.  Further, the PrePetition Lender/Committee Settlement results in the deemed waiver of the LSA Deficiency Claim on the Effective Date, which LSA Deficiency Claim would otherwise significantly dilute the distribution that may be available to unsecured creditors by increasing the "pool" of claims that would participate in any distribution.

Finally, liquidation in chapter 7 would not afford unsecured creditors the concessions made on the Debtors' Professional fees that are contained in this Plan.  These fees, if approved, would be payable as chapter 11 administrative expenses, and may need to be satisfied in full prior to a prepetition unsecured creditor receiving any distribution in these cases.

## ARTICLE V.
## PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

A.    GENERAL

The following provides a summary of various important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Claims and Equity Interests that are Impaired should read and carefully consider the factors set forth below.

B.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.    General

The Plan provides for conditions that must be satisfied (or waived) prior to the Confirmation Date and for other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

2.    Failure to Confirm the Plan

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modification would not necessitate the resolicitation of votes to accept the Plan, as modified.

3.    Non-Occurrence of the Effective Date

Operating in bankruptcy imposes significant risks on the Debtors' operations.  Although the Debtors and Committee believe that the Effective Date will occur on or before March 31, 2016, there can be no assurance as to such timing or that the conditions to the Effective Date will ever be satisfied.

If the Effective Date does not occur by March 31, 2016, the Debtors and Committee may determine, upon notice to the Bankruptcy Court, that the Plan is null and void in all respects, and nothing contained in the Plan, the Confirmation Order or the Disclosure Statement shall:  (1) constitute a waiver or release of any Cause of Action or Claim by any party;  (2) constitute an admission, acknowledgment, offer or undertaking in any respect by any party, including the Debtors; or (3) otherwise prejudice in any manner the rights of any party, including the Debtors.

Pursuit of litigation by the parties in interest could disrupt the confirmation of the Plan.  There can be no assurance that any parties in interest will not pursue litigation strategies to enforce any Claims in respect of the Debtors.  Litigation is by its nature uncertain and there can be no assurance of the ultimate resolution of such claims.  The pursuit of litigation in connection with objections to this Disclosure Statement or the Plan could delay and disrupt confirmation of the Plan.  Any litigation may be expensive, lengthy and disruptive to the Debtors' normal business operations and the Plan confirmation process, and a resolution of any such strategies that is unfavorable to the Debtors could have a material adverse effect on the Plan confirmation process.

C.    RISK FACTORS THAT MAY AFFECT DISTRIBUTIONS TO CREDITORS

1.    Litigation Risk in Connection with the Liquidating Trust

The recoveries described herein are contingent upon the successful resolution numerous litigations that will be brought by the Liquidating Trust. The outcomes of these litigations are unknown and contain risks.

>2.      Contingent Nature of Assets

The Plan contemplates the post-Confirmation liquidation of the Debtors' Sale Assets, and the post-Effective Date litigation of claims by the Liquidating Trust. The Committee and the Debtors will work cooperatively to ensure that the marketing process for the Sale Assets yields proceeds that are maximized under the circumstances of these cases. Ultimately, however, there can be no assurance that any assets will be realized through the Sale that will be distributable to unsecured creditors.

>D.    DISCLOSURE STATEMENT DISCLAIMER

>1.      Information Contained Herein Is for Soliciting Votes

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. Any references herein, or in any of the Exhibits hereto, regarding the potential value of any particular piece of litigation or any other asset is an estimate for the purposes of soliciting votes to accept or reject this Plan. Neither the Debtors, the Committee, nor the Liquidating Trust (and the Liquidating Trustee) shall be bound, in any way, to the value ascribed to any litigation or asset set forth herein, and these estimates shall not be considered as settlement parameters or an offer for settlement or resolution of any particular claim or cause of action.

>2.      This Disclosure Statement Was Not Approved by the Securities and
>Exchange Commission

This Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

>3.      This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

4.       No Legal or Tax Advice Is Provided to You by this Disclosure Statement

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.       No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest.

6.       Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Liquidating Trust may seek to investigate, File and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

7.       No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors  or the Litigation Trust (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

8.       Information Was Provided by the Debtors and Was Relied Upon by the Debtors' and the Committee's Advisors

Counsel to and other advisors retained by the Debtors and the Committee have relied upon information provided by the Debtors in connection with the preparation of this Plan.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Plan, neither they nor the Committee's Professionals have verified independently the information contained herein.

9.       Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Plan are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Plan after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors

have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan, neither the Debtors nor the Committee (nor their respective Professionals) can, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Plan, neither the Debtors nor the Committee have an affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

> 10.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Committee and the United States Trustee.

> E.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan and related transactions to the Debtors and certain Holders of Claims and Shareholders (as defined below). This summary is based on the Internal Revenue Code of 1986 (the "IRC"), Treasury Regulations (proposed, temporary and final) issued thereunder ("Treasury Regulations") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service ("IRS") will not challenge one or more of the tax consequences of the Plan described below.

The following summary is for general information only. The tax treatment of beneficial owners of Claims (each a "Holder" and collectively, the "Holders") may vary depending on such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in this Plan. This summary also does not address the U.S. federal income tax consequences to Holders that are not United States Persons (as such term is defined in the IRC) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, partnerships or other pass-through Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following

discussion assumes that Claims are held by Holders as "capital assets" within the meaning of section 1221 of the IRC and that all claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.  Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Holders based upon their particular circumstances.  Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE SOLICITATIONS OF VOTES ON THE PLAN OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

    1.      Consequences to Holders of General Unsecured Claims and Customer Claims

Pursuant to the Plan, Holders of General Unsecured Claims (Class 4), and Customer Claims (Class 5) will receive Cash distributions the Sale Proceeds, if any, and beneficial interests from the Liquidating Trust.

    2.      Gain or Loss

In general, a Holder of an Allowed LSA Claim, General Unsecured Claim or Customer Claims will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received by the Holder in respect of its Claim (other than any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such Cash) and (ii) the Holder's adjusted tax basis in its Claim (other than tax basis attributable to accrued but unpaid interest).

Due to the possibility that Holders of Allowed LSA Claims, General Unsecured Claims and Customer Claims may receive additional Cash Distributions subsequent to the Effective Date upon a subsequent disallowance of Disputed Claims, the imputed interest provisions of the Tax

Code may apply to treat a portion of such subsequent Distributions as imputed interest. Additionally, because Distributions may be made to Holders after the Effective Date, any loss and a portion of any gain realized by such Holder may be deferred until such time as such Holder has received its final Distribution. All Holders of LSA Claims, General Unsecured Claims and Customer Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting any gain that may be recognized by such Holder in respect of its Claim.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction. A Holder of an LSA Claim, General Unsecured Claim or Customer Claim that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

3.      Distributions in Satisfaction of Accrued but Unpaid Interest

In general, to the extent that any consideration received pursuant to the Plan by a Holder of an Allowed LSA Claim, General Unsecured Claim or Customer Claim is received in satisfaction of interest accrued but unpaid during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent that any accrued interest claimed was previously included in its gross income and is not paid in full.

Pursuant to the Plan, except as otherwise provided in the PrePetition Credit Agreement, all distributions in respect of Allowed LSA Claims, General Unsecured Claims or Customer Claims will be allocated first to the principal amount of such Claims, as determined for U.S. federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

4.      Information Reporting and Backup Withholding

All Distributions to Holders of Allowed Claims (including Allowed General Unsecured Claims) under the Plan are subject to any applicable withholding (including employment tax withholding). Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes

an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a Distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.

5.      Consequences to Holders of Class 6 Claims

Pursuant to the Plan, a Holder of Equity Interests will receive no distribution and its Equity Interests will be discharged, cancelled, released and extinguished as of the Effective Date. Section 165(g) of the IRC permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year. Thus, a Holder of Equity Interests may be entitled to a worthless security deduction. The rules governing the timing and amount of worthless security deductions place considerable emphasis on the facts and circumstances of the Holder, the issuer, and the instrument with respect to which the deduction is claimed. Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

6.      Accrued Interest

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the Holder as ordinary interest income to the extent not already taken into income by the Holder. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by Boomerang. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which an amount received by a Holder of a Claim will be attributable to accrued interest on the debt instrument constituting the Claim is unclear. Certain Treasury Regulations treat a payment under a debt instrument first as a payment of accrued and unpaid interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, all

41

distributions in respect of any Claim will be allocated first to the principal amount of such claim, to the extent otherwise permitted and as determined for U.S. federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

F.     POTENTIAL RECHARACTERIZATION OF LSA CLAIMS

Recharacterization, or the power to treat a debt as if it were actually a shareholder interest, "emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance." In re SubMicron Sys. Corp., 291 B.R. 314, 322 (D. Del. 2003) aff'd, 432 F.3d 448 (3d Cir. 2006) (quoting Matter of Fabricators, Inc., 926 F.2d 1458, 1469 (5th Cir. 1991). The remedy is most commonly invoked when an insider purports to loan money to a company when it is undercapitalized and the cash infusion should have taken the form of a capital contribution. Recharacterization ensures that non-insider creditor claims will be paid first from the available assets of the corporation.

In the present case, the Estates could potentially have a recharacterization claim with respect to the LSA Claims because (1) a number of the LSA Claims are held by insiders, (2) the Debtors may have been insolvent when the debt was incurred, and (3) LSA has built in warrant protection. Courts consider various factors when determining whether a debt should be recharacterized, including: (i) the labels given to the debt, (ii) the presence or absence of a fixed maturity date, (iii) interest rate and schedule of payments, (iv) whether the borrower is adequately capitalized, (v) whether the loan is secured and (vi) the corporation's ability to obtain financing from outside lending institutions. No one factor is controlling, and the Third Circuit recently indicated that the focus of the inquiry is on the parties' intent, and is not limited by a strict factor-based analysis. In re Optim Energy, LLC, No. 14-10262 (BLS), 2014 WL 1924908, at *7 (Bankr. D. Del. May 13, 2014) aff'd, 527 B.R. 169 (D. Del. 2015). Thus, whether the Bankruptcy Court would recharacterize the LSA Claims as shareholder interest rather than debt remains unclear.

Absent approval of the PrePetition Lender/Committee Settlement under the Plan, litigation could become necessary to resolve the Estates' recharacterization claim, and the rights of all parties (including the Debtors, the Committee, the PrePetition Administrative Agent and the LSA Lenders) are reserved in connection with any such litigation. In order to avoid the costs and uncertainties inherent in any litigation, the Debtors and Committee propose to resolve the Estates' recharacterization claim (and other potential claims) against the LSA Lenders on the terms set forth in the Plan, subject to the occurrence of the Effective Date of the Plan.

## ARTICLE VI.
## SUMMARY OF CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

THE FOLLOWING CHART IS A SUMMARY OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE UNCERTAINTIES AND RISKS RELATED TO THE SALE AND THE LIQUIDATING TRUST MAKE IT DIFFICULT TO DETERMINE A PRECISE VALUE FOR THE DISTRIBUTIONS TO BE MADE UNDER THE LIQUIDATING PLAN. THE RECOVERIES AND ESTIMATES DESCRIBED IN THE FOLLOWING TABLES

REPRESENT THE DEBTORS' AND COMMITTEE'S BEST ESTIMATES GIVEN THE INFORMATION AVAILABLE ON THE DATE OF THIS DISCLOSURE STATEMENT. ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AS TO THE AMOUNT OF CLAIMS ARE ONLY ESTIMATES BASED ON INFORMATION KNOWN TO THE DEBTORS AND COMMITTEE AS OF THE DATE HEREOF, AND THE FINAL AMOUNTS OF CLAIMS ALLOWED BY THE BANKRUPTCY COURT MAY VARY SIGNIFICANTLY FROM THESE ESTIMATES.  REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN. A MORE DETAILED DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS IS FOUND ON PAGES 31-36 HEREIN.

AS DEMONSTRATED IN THE LIQUIDATION ANALYSIS ATTACHED AS EXHIBIT B HERETO, WITH RESPECT TO EACH CLASS OF CREDITORS, RECOVERIES UNDER THE PLAN ARE EQUAL TO OR GREATER THAN RECOVERIES IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION.

A CHART SUMMARIZING THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND POTENTIAL DISTRIBUTIONS APPEARS BELOW.

| Class | Type of Claim or Equity Interest | Treatment of Claim/Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests under the Plan | Estimated Percentage Recovery of Allowed Claims or Interests under the Plan (if Classes 3, 4, and 5 accept the Plan) |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $71,122.96-$209,210.75 | 100% |
| 2 | Other Secured Claims | Unimpaired | $0 | 100% |
| 3 | LSA Claims | Impaired | $11,889,717.00[1] | 1-10% |
| 4 | General Unsecured Claims | Impaired | $5,604,626.01 | 1-10% |
| 5 | Customer Claims | Impaired | $17,185,135.57 | 1-10% |
| 6 | Equity Interests in Boomerang Systems, Inc. | Impaired | N/A | 0.0% |
| 7 | Intercompany Claims | Impaired | $33,571,389.51 | 0.0% |

[1] This amount excludes the claim held by Parking Source LLC.

# ARTICLE VII.
## ADMINISTRATIVE, DIP FACILITY AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article VI.

A.    Administrative Claims

Subject to the provisions of sections 327, 328, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors (and the Committee) agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter;  (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due;  (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Liquidating Trust, as the case may be;  or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court;  provided, that, Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in Cash in the ordinary course of business in accordance with the Budget and the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions;  provided, further, that Allowed Administrative Claims do not include Claims Filed after the Administrative Claims Bar Date (except as otherwise provided by a separate order of the Bankruptcy Court).

**For the avoidance of doubt, no Professional in this Chapter 11 Case (or the PrePetition Administrative Agent's professionals) will be entitled to professional fees in excess of their cap attached to the DIP Budget filed with the Court as part of the approval of the amended DIP Facility, other than the Committee Professionals who may seek reimbursement of allowed fees and expenses from the Liquidating Trust; <u>provided, however</u>, that Professionals (other than the Committee's professionals and the PrePetition Administrative Agent's professionals) shall be entitled to share Pro Rata in the Professional Excess Sale Proceeds to the extent that Professional Excess Sale Proceeds arise from the Sale; <u>provided</u>, <u>further</u>, <u>however</u>, that to the extent there are no Professional Excess Sale Proceeds, Ciardi, Ciardi & Astin shall be reimbursed up to $6,000 by the Liquidating Trust for allowed and unsatisfied expenses (if any) incurred during these Chapter 11 Cases, which payment shall be made *pari passu* with payments, if any, made to Committee Professionals for allowed fees and expenses incurred during the chapter 11 cases; provided, further, however, that the PrePetition Administrative Agent's professionals may recover fees and expenses from distributions made on account of Allowed LSA Claims to the extent permitted under the Prepetition Credit Agreement.**

B.      DIP Facility Claims

Notwithstanding anything to the contrary herein, and subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims, on the Effective Date, the DIP Facility Claims will either be satisfied from a (i) credit bid of the full amount of the DIP Facility Claims, for the Sale Assets (ii) be paid in full from the Gross Sale Proceeds.

C.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash over a period ending not later than five years after the Petition Date of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable non-bankruptcy law pursuant to section 511 of the Bankruptcy Code.  On the Effective Date, the Liens securing any Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

# ARTICLE VIII.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      Classification of Claims

Pursuant to Article IX hereof, the Plan provides for the substantive consolidation of the Debtors' Estates into one Estate solely for Plan purposes, including voting, Confirmation and distributions.  The following tables classify Claims and Interests with respect to the Debtors' Estates, except DIP Facility Claims, Administrative Claims and Priority Tax Claims, for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is classified in a particular Class only to the extent that any such Claim or Interest is an Allowed Claim in that Class and has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

1.      Summary of Classification and Treatment of Claims and Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claim | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claim | Unimpaired | Deemed to Accept |
| 3 | LSA Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Customer Contract Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests | Impaired | Deemed to Reject |
| 7 | Intercompany and Insider Claims | Impaired | Deemed to Reject |

B.    Treatment of Claims and Interests

1.    Class 1 — Other Priority Claims

(a)    Classification:  Class 1 consists of all Other Priority Claims that may exist against the Debtors.

(b)    Treatment:  Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement and release of each Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable after either;  provided, that, subject to Bankruptcy Court approval, priority wage claims may be paid in full in the ordinary course of business.

(c)    Voting:  Class 1 is Unimpaired, and Holders of Class 1 Other Priority Claims are conclusively presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Secured Claims

(a)    Classification:  Class 2 consists of all Other Secured Claims that may exist against the Debtors.

(b)    Treatment:  Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement and release of each Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the Debtors and the Committee, shall (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable after either.

(c)    Voting:  Class 2 is Unimpaired, and Holders of Class 2 Other Secured Claims are conclusively presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy

Code.  Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 — LSA Claims

(a)    Classification:  Class 3 consists of LSA Claims against the Debtors, which shall be Allowed upon the occurrence of the Effective Date in the aggregate amount of $11,889,717, excluding the Claim held by Parking Source LLC.

(b)    Treatment:  In exchange for full and final satisfaction, settlement and release of each LSA Claim, each Holder of an LSA Claim shall receive their Pro Rata interest in the LSA Assets.  As set forth in Article IX hereof, pursuant to the PrePetition Lender/Committee Settlement, the LSA Lenders shall be deemed to have waived any right, title or interest in and to the Liquidating Trust and the Liquidating Trust Assets—which waiver includes a full waiver of the LSA Deficiency Claims.  Notwithstanding anything to the contrary herein, the LSA Lenders shall have the right to receive the LSA Assets from the Liquidating Trust, as proceeds are realized from the liquidation or administration of any LSA Asset.  All distributions to the LSA Claims—from the Debtors, these Estates, or the Liquidating Trust via the Liquidating Trustee—shall be payable to the PrePetition Administrative Agent and distributed in accordance with the terms of the PrePetition Credit Agreement.

(c)    Voting:  Class 3 is Impaired and Holders of LSA Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 — General Unsecured Claims

(a)    Classification:  Class 4 consists of General Unsecured Claims that may exist against the Debtors.

(b)    Treatment:  Each Holder of an Allowed General Unsecured Claim shall receive in exchange for full and final satisfaction, settlement and release of each General Unsecured Claim, its Pro Rata beneficial  interest in the Liquidating Trust.

(c)    Voting:  Class 4 is Impaired, and Holders of Class 4 General Unsecured Claims are entitled to vote to accept or reject.

5.    Class 5 – Customer Contract Claims

(a)    Classification:  Class 5 consists of Customer Contract Claims that may exist against the Debtors.  Pursuant to the Court's Order Granting Limited Relief From Automatic Stay [Docket No. 340] ("Stay Relief Order"), each of Holder of a Customer Contract Claim was provided with relief from the automatic stay imposed by section 362 of the Bankruptcy Code, to the extent necessary, to pursue a claim payable from the E&O Insurance.  Class 5 Claimants shall retain the right, if any, afforded under the Stay Relief Order.

(b)    Treatment: Each Holder of an Allowed Customer Contract Claims shall receive in exchange for full and final satisfaction, settlement and release of each Allowed Customer Contract Claims its Pro Rata beneficial interest in the Liquidating Trust.

(c)     Voting:  Class 5 is Impaired, and Holders of Class 5 Customer Contract Claims are entitled to vote to accept or reject

6.     Class 6 — Equity Interests

(a)     Classification:  Class 6 consists of all Equity Interests in any of the Debtors

(b)     Treatment:  Holders of Equity Interests will not receive any distribution on account of such Interests, and Equity Interests shall be discharged, cancelled, released and extinguished as of the Effective Date.

(c)     Voting:  Class 6 is Impaired, and Holders of Class 6 Equity are not entitled to receive or retain any property under the Plan on account of Equity Interests.  Therefore, Holders of Class 6 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class 6 Equity Interests are not entitled to vote to accept or reject the Plan.

7.     Class 7 — Intercompany Claims

(a)     Classification:  Class 7 consists of all Intercompany Claims.

(b)     Treatment:  Holders of Intercompany Claims will not receive any distribution on account of such Claims.

(c)     Voting:  Class 7 is Impaired, and Holders of Class 7 Intercompany Claims are conclusively presumed to have Rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan.

C.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Liquidating Trust's rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.     Acceptance or Rejection of the Plan

1.     Presumed Acceptance of Plan:  Classes 1 and 2 are Unimpaired under the Plan and are, therefore, presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Classes are not entitled to vote on the Plan and the vote of such Holders of Claims shall not be solicited.

2.     Voting Classes:  Each Holder of an Allowed Claim in each of Classes 3, 4 and 5 shall be entitled to vote to accept or reject the Plan.

48

3.      Presumed Rejection of the Plan:  Classes 6 and 7 are Impaired and Holders of Class 6 Interests and Class 7 Claims shall receive no distributions under the Plan on account of their Claims or Interests and are therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Interests and Class 7 Claims are not entitled to vote on the Plan and the vote of such Holders shall not be solicited.

4.      Elimination of Vacant Classes; Deemed Acceptance by Non-Voting Classes

(a)      Any Class of Claims that is not occupied as of the commencement of the Combined Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.      Controversy Concerning Impairment:  If a controversy arises as to whether any Claims, or any Class of Claims, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

E.      <u>Nonconsensual Confirmation</u>

Except as otherwise specifically provided in the Plan, if any Impaired Class shall not Accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

**ARTICLE IX.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      <u>The PrePetition Lender/Committee Settlement</u>

This Plan is premised upon, and incorporates, (i) the PrePetition Lender/Committee Settlement, a proposed settlement by and between the Committee and the LSA Lenders, and (ii) the sale of substantially all the Debtors' Sale Assets pursuant to a sale under 11 U.S.C. § 363. The PrePetition Lender/Committee Settlement has been negotiated by counsel for the Committee and counsel for the PrePetition Administrative Agent.  The fundamental terms of the PrePepition Lender Settlement are set forth in this Plan, which provides for the allocation of proceeds received from the Sale process and from the Liquidating Trustee's administration of certain litigation assets.  This allocation is intended to ensure that unsecured creditors will benefit from the efforts of the Committee and the Liquidating Trustee in administering and liquidating the Debtors' assets and litigation rights.

Pursuant to the terms of the PrePetition Lender/Committee Settlement, and upon the Effective Date, the LSA Lenders shall be deemed to waive their deficiency claim against these

Estates and the Liquidating Trust, such that the only assets that will be available to satisfy the LSA Claims are the LSA Assets. For the avoidance of doubt, the LSA Lenders will have no right to payment from, claims against, or any other redress to, the Liquidating Trust, the Liquidating Trustee, or the Liquidating Trust Assets, other than the right to receive distributions of the LSA Assets as set forth in the Plan.

In addition, the Committee—subject to the occurrence of the Effective Date—agreed to waive any claims that it may have to seek to subordinate, recharacterize, or otherwise challenge the validity, priority or extent of any of the secured claims held by the LSA Lenders. Finally, the Committee and the Debtors have agreed to provide the limited releases afforded to the LSA Lenders, the PrePetition Administrative Agent, and its professionals, which are set forth in Article XV herein.

The PrePetition Lender/Committee Settlement is an integral component of this Plan, and its terms are incorporated throughout the Plan. Without the PrePetition Lender Settlement, the Committee would not be willing to: (i) act as a co-proponent of this Plan, or (ii) conduct the Sale of the Debtors' assets as contemplated by this Plan. The Confirmation Order shall be deemed an Order of the Bankrutpcy Court pursuant to Bankruptcy Rule 9019 approving the PrePetition Lender Settlement as being in the best interests of these Estates and all creditor constituencies.

B.    Substantive Consolidation

(i)    This Plan provides for the substantive consolidation of the Debtors' Estates, but solely for purposes of the Plan, including voting on the Plan by Holders of Claims, making distributions to Holders of Claims in such Class under the Plan and Confirmation. The Debtors reserve all rights with respect to the substantive consolidation of the Debtors.

(ii)    On the Effective Date, (i) all assets and liabilities of the Debtors will, solely for voting and distribution purposes, be treated as if they were merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) any Claims Filed or to be Filed in the Chapter 11 Cases will be deemed single Claims against all of the Debtors, (iv) all transfers, disbursements and distributions to Claims made by any Debtor hereunder will be deemed to be made by all of the Debtors, and (v) any obligation of the Debtors as to Claims will be deemed to be one obligation of all of the Debtors. Holders of Allowed Claims shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Except as set forth in this Article, such substantive consolidation shall not (other than for purposes related to the Plan) (w) affect the legal and corporate structures of the Debtors, (x) cause any Debtor to be liable for any Claim or Equity Interest under the Plan for which it otherwise is not liable, and the liability of any Debtor for any such Claim or Equity Interest shall not be affected by such substantive consolidation, (y) except as otherwise stated in the Plan, affect Intercompany Claims of Debtors against Debtors and (z) affect Equity Interests in the Debtors' non-debtor Affiliates.

C.    Sale of Debtors' Sale Assets Pursuant to the Sale Motion.

As a result of the participation in the DIP Financing by the Debtors' insiders, the Debtors, GOTI, and the Committee have agreed that the Committee and its professionals will conduct the

marketing and sale process for the Debtors' assets.  Messrs. Patterson and Gelly, along with two other knowledgeable employees, will remain with the Debtors throughout the sale and plan confirmation process, and assist the Committee and its professionals in the marketing and sale process.  The Committee and its professionals will be vested—through the Order approving the Bid Procedures contemplated in this Motion—with the authority to control the sale process, including the determination of: (i) which bids and bidders are qualified to participate in the auction process; (ii) which bid is used to commence the auction process; and (iii) which bid is the highest and best offer to be submitted to the Court for approval."

The Plan contemplates that the Sale process may be commenced with a "Stalking Horse" bid in the form of a credit bid for the full value of the DIP Facility Claims.  The Committee and its retained professionals, with the active involvement of the Debtors' remaining officers, directors and employees, will actively market the sale in pursuit of a higher and better offer to purchase the assets (or any portion of the assets).  The procedures for: (i) marketing the Sale Assets; (ii) submitting competing bids for the Sale Assets; (iii) conducting the Auction; (iv) assuming and assigning Executory Contracts; and (v) approving the Sale are all fully set forth in the Bid Procedures Order entered by the Bankruptcy Court (which is available at www.gcginc.com/cases/bmr).  The parties submit that more than ample business justification exists to sell the Sale Assets pursuant to the Bidding Procedures.  First, the is the most likely alternative to achieve the highest and best price for the Sale Assets.  The Debtors' assets consist primarily of intellectual property and other engineering assets that are only valuable if the Debtors' management is actively involved in the sale process.  Without this involvement, few, if any, potential purchasers will have the ability to use the Debtors' assets in developing and growing an ongoing business.  The Sale will ensure the active involvement and availability of the Debtors' management, all under a process that is conducted by the Committee and its professionals.  Under the specific and unique facts and circumstances of these cases, this process represents the best chances and obtaining the maximum value for the Debtors' assets.

Furthermore, the Debtors do not have sufficient funding to delay the sale process for any significant period of time beyond the timeframe proposed herein, and the Acquired Assets will only decline in value absent a prompt Sale.  The Committee's professionals have already begun collaborations with the Debtors to commence the marketing efforts.  These efforts will include attempting to identify and contact all strategic purchasers of the Debtors' assets.  The process will start with a broad dissemination of a "teaser" that is intended to test interest for these assets.  The Committee's professionals will continue to work with the Debtors to facilitate the open and fair exchange of information with any potential purchaser who complies with the Bid Procedures (including the submission of a Non-Disclosure Agreement).  Ultimately, the process will continue with the submission of Qualified Bids (as defined in the Bid Procedures) occurring after the Combined Hearing.  Shortly thereafter, the Committee may conduct an Auction, to the extent that competing Qualified Bids are obtained.  Immediately following the Auction, the Committee and the Debtors will seek the Bankruptcy Court's approval of the Sale.  It is anticipated that the Auction will occur within 21 days following the entry of the Confirmation Order, and that the hearing to consider approval of the Sale will happen within 2 business days of the Auction.  For specific dates and additional details, any interest party should consult the Bid Procedures Order.

The Bidding Procedures are designed to maximize the value received for the Sale Assets by allowing for a timely and efficient auction process, while providing bidders and consultants with ample time and information to submit a timely bid. The Bidding Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price. The Joint Movants are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the assets. The Sale will be further subject to a market check through the solicitation of competing bids in a Court-supervised auction process as set forth in the Bidding Procedures. Therefore, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable.

With respect to the authority vested in the Committee with respect to the sales process, the Committee shall be required to consult with the Debtors and their professionals on all decisions.

D.      Establishment of the Liquidating Trust.

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. In the event of any conflict between the terms of this Plan and the terms of the Liquidating Trust, the terms of this Plan shall govern. On the Effective Date, the Debtors shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust.

E.      Purpose of the Liquidating Trust.

In accordance with Treasury Regulation section 301.7701-4(d), the Liquidating Trust shall be established for the purposes of (i) liquidating any non-Cash Liquidating Trust Assets; (ii) prosecuting and resolving the Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof; and (iv) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with this Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary for, and consistent with, the liquidating purpose of the Liquidating Trust.

F.      Appointment of the Liquidating Trustee.

The initial Liquidating Trustee shall be selected by the Committee, and appointed through the Confirmation Order. The Liquidating Trustee shall act in such capacity, and shall have the same powers, as the board of directors and officers of the Debtors. The Liquidating Trustee may resign at any time without penalty or liability therefor; provided, however, that notice of the resignation shall be Filed not less than twenty-five (25) Business Days prior to the effective date of such resignation, and such resignation shall not be effective until a successor Liquidating Trustee is designated and approved.

G.    Compensation to Liquidating Trustee.

The Liquidating Trustee shall be compensated in accordance with the relevant provisions of the Liquidating Trust Agreement and any other applicable orders of the Bankruptcy Court.

H.    Liquidating Trust Assets.

On the Effective Date, or as soon thereafter as is practicable, all of the property of the Estates shall be transferred and distributed to and shall vest in the Liquidating Trust without further action or Court order, including, without limitation, (i) all of the Debtors' unencumbered assets; (ii) the Debtor Causes of Action; (iii) the Liquidating Trust Assets; and (iv) all Cash; provided, however, that the Professional Excess Sale Proceeds shall be used to satisfy unpaid Allowed Professional fee Claims (other than the Committee's Professionals, but including Professionals of the PrePetition Administrative Agent) in excess of the Budget attached to the Final DIP Order.  The Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust.

The Liquidating Trust shall have the power to act with respect to the aforementioned assets being assigned and distributed to the Liquidating Trust, and shall have the right and power, as representative and attorney in fact for the Estates, to prosecute the aforementioned rights, claims and causes of action, including, without limitation, objections to Claims and Avoidance Actions, without further Bankruptcy Court approval.  From and after the Effective Date, prosecution and settlement of all Causes of Action transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to this Plan and the Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Debtors' Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Debtors' Estates pursuant to Bankruptcy Code section 1123(b)(3).  The Estates shall retain the right, title and interest in and to all rights, claims and Causes of Action against third parties in order to preserve such rights, claims and Causes of Action; and the Liquidating Trustee, as representative of the Estates appointed for such purpose, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, may enforce such claims as he deems appropriate.

I.    Tax Treatment of Transfer of Property to Liquidating Trust.

The transfer of property from the Debtors to the Liquidating Trust shall be treated for all purposes of the IRC as a transfer to the beneficiaries of the Liquidating Trust to the extent such Claims are Allowed as of the Effective Date, followed by a deemed transfer by such beneficiaries to the Liquidating Trust.  The beneficiaries of the Liquidating Trust shall be treated as the grantors and deemed owners of the Liquidating Trust.  The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Liquidating Trustee and the beneficiaries of the Liquidating Trust shall value the property transferred to the Liquidating Trust consistently, and such valuation shall be used for all federal income tax purposes.  The Debtors may request the Court to value the property transferred to the Liquidating Trust at confirmation of the Plan, or any time thereafter.  The

beneficiaries of the Liquidating Trust shall be responsible for payment of any taxes due with respect to the operations of the Liquidating Trust.

The Liquidating Trust may request an expedited determination of taxes of the Debtors or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust. The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Debtors and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

J.      Debtors' Tax Returns.  The Liquidating Trustee or his designee shall have the authority to sign and file the Debtors' final local, state and federal tax returns or similar documents.

K.      Responsibilities & Powers of the Liquidating Trustee.

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).  The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with this Plan; (g) undertake all administrative functions of the Plan Debtors' Chapter 11 Cases, including the payment of fees payable to the United States Trustee and the ultimate closing of the Debtors' Chapter 11 Cases. The Liquidating Trust is the successor to the Debtors and their Estates.

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtors and their respective Estates; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code section 345 or in other prudent investments, provided, however, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

The Liquidating Trust shall have the right to object to Claims not otherwise Allowed in connection with post-Effective Date Claims allowance process.

Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action that are not expressly released or waived under this Plan are reserved and preserved and vest in the Liquidating Trust in accordance with this Plan. No Person may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under this Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of this Plan. No claims or Causes of Action against the Released Parties shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

L.    <u>Preservation of Investigation Rights</u>.

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtors or the Committee prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

M.    <u>Bond</u>.

The Liquidating Trustee shall not be required to post a bond with respect to the performance of the obligations and liabilities of the Liquidating Trustee under the Plan or the Liquidating Trust.

N.    <u>Beneficiaries</u>.

The beneficiaries of the Liquidating Trust shall consist of Holders of Class 4 and Class 5 Claims. Such beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

O.    <u>Expenses Incurred on or After the Effective Date</u>.

The Liquidating Trustee may incur Liquidating Trust Expenses as set forth more fully in the Liquidating Trust Agreement. The Liquidating Trustee may retain and compensate attorneys and other professionals to assist in its duties on such terms (including on a contingency or hourly

basis) as it deems reasonable and appropriate without Bankruptcy Court approval.  As set forth herein, the fees and expenses of the Liquidating Trustee and the Liquidating Trust's Professionals shall be paid from the assets of the Liquidating Trust, with a higher priority than any payments made to Allowed Claimants herein.

P.    Distributions from the Liquidating Trust.

The Liquidating Trustee shall make all applicable distributions and deliveries required under the Plan as set forth more fully in the Liquidating Trust Agreement.  Any distributions to beneficiaries of the Trust shall be made at a time, and in a manner, that the Liquidating Trustee determines, in his sole discretion, is reasonable and appropriate under the circumstances.  Any fees, expenses, costs or other payments required by the Liquidating Trust—including compensation to the Liquidating Trustee and his professionals—shall be payable from first money in to the Liquidating Trust, and such fees and expenses must be satisfied in full—or a reasonable reserve shall be established and maintained to ensure the full satisfaction—prior to distribution to beneficiaries under this Plan or the Liquidating Trust Agreement.

Q.    Termination of the Liquidating Trust and Filing of Final Report.

The Liquidating Trust shall terminate without any further action by the Liquidating Trustee upon the earlier of the docketing of a Final Order closing the Case and five (5) years after the Effective Date, unless such termination date is extended by order of the Court upon a finding that the extension is necessary to the liquidating purposes of the Liquidating Trust.  Prior to such termination and within thirty (30) days after the Final Distribution Date, the Liquidating Trustee shall file with the Court, and serve on the United States Trustee and the parties appearing on the latest Master Service List, a final report containing a detailed and cumulative statement of all activities of the Liquidating Trust during its existence, as set forth more fully in the Liquidating Trust Agreement.

R.    Litigation of Causes of Action by the Liquidating Trustee.

The Liquidating Trustee shall have the power and authority to bring or continue all Causes of Action, including Avoidance Actions, after the Effective Date.  To avoid all doubt, the power granted to the Liquidating Trustee in the foregoing sentence shall include (but not be limited to) the power to bring or continue Avoidance Actions and any and all other claims, actions, causes of action, suits, controversies, and the like not released herein.

Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than one million dollars ($1,000,000); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds one million dollars ($1,000,000).  The decision to settle, prosecute or waive any cause of action shall be made by the Liquidating Trustee in his sole discretion--subject to Bankruptcy Court approval as set forth in sub-paragraph (ii) above.

S.      Exculpation.

No recourse will ever be had, directly or indirectly, against the Liquidating Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under this Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the Liquidating Trust Assets. The Liquidating Trustee and its agents shall not be deemed to be the agent for any holder of a Claim in connection with Distributions made under this Plan. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; provided, however, that this section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.


T.      Dissolution of Committee.

The Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Committee's attorneys, accountants, financial advisors, and other agents shall terminate.  All expenses of Committee members and the fees and expenses of their professionals through the Effective Date shall be paid in accordance with the terms and conditions of the Professional Fee Order, the Plan and any other Bankruptcy Court orders.

U.      Cancellation of Existing Securities.

Except as otherwise provided in this Plan and in any contract, instrument or other agreement or document created in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI of this Plan, all promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Claims or Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under any such notes, share certificates and other agreements and instruments governing such Claims and Interests shall be discharged.  The Holders of or parties to such canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

V.    <u>Charitable Donation</u>.

On or about the time that the final Distribution is made, the Liquidating Trustee may make a charitable donation with undistributed funds if, in the reasonable judgment of the Liquidating Trustee, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtors or the Liquidating Trustee.

## ARTICLE X.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    <u>Rejection of Contracts</u>.  Except for those executory contracts and unexpired leases listed in Section B of this Article XI, and as otherwise provided in this Article X, pursuant to sections 365 and 1123(b) of the Bankruptcy Code, all prepetition executory contracts and unexpired leases that exist between the Debtors and any Person shall be deemed rejected by the Debtors effective as of the Effective Date subject to the occurrence of the Effective Date, except for executory contracts and unexpired leases which:

1.    have been assumed, assumed and assigned, or rejected (including rejection with a delayed effective date), as applicable, pursuant to an order of the Bankruptcy Court entered prior to the Effective Date;

2.    will be assumed and assigned as part of the Sale (as listed in Section B of this Article X); or

3.    as of the Effective Date, are subject to a pending motion for approval of the assumption, assumption and assignment, or rejection, as applicable.

B.    <u>Assumption Certain Executory Contracts and Unexpired Leases</u>.  As part of the Sale, the Debtors intend to assume and assign the following executory contracts and unexpired leases to the purchaser of the Sale Assets:

1.    Ground Lease, dated as of April 30, 2010, by and between Route 94 Development Corporation and Boomerang Sub, Inc.

C.    <u>Rejection Damages Bar Date</u>.  If the rejection by a Debtor of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against any Debtor or their Estates unless a proof of claim is filed with the Debtors' Claims agent, the Garden City Group, and served upon counsel to the Debtors and counsel to the Committee (or the Liquidating Trustee, whichever is applicable) within thirty (30) days after service of the later of (a) notice of the Effective Date or (b) other notice that the executory contract or unexpired lease has been rejected.  Nothing in this Article X shall revive or deem to revive a previously Disallowed Claim or extend a previously established bar date, if applicable.  The bar date for filing a Claim with respect to an executory contract or unexpired lease other than pursuant to this Plan shall be as set forth in the Bar Date Order or the Final Order approving such rejection.

D.    Survival of PrePetition Credit Agreement.    Notwithstanding anything else in this Plan, the Prepetition Credit Agreement shall remain in effect on and after the Effective Date, as necessary to, among other things, authorize the Prepetition Administrative Agent to make distributions to Holders of Allowed LSA Claims as contemplated under the Plan.    For the avoidance of doubt, the obligation of each and every Holder of an LSA Claim to indemnify, defend, reimburse or limit the liability of the Prepetition Administrative Agent shall remain in full force and effect.

**ARTICLE XI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.    Distributions for Claims Allowed as of the Effective Date.    Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.    Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.    Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made as set forth herein.    Any Claim that either: (i) has been or is hereafter listed in the Schedules as disputed, contingent, or unliquidated; or (ii) is not otherwise listed in the Schedules, and in either instance of subparagraph (i) or (ii) for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

B.    Disbursing Agent.    The Liquidating Trustee shall make all distributions from the proceeds of the respective assets transferred to the Liquidating Trust as required under this Plan.

C.    Subsequent Distributions.    The Liquidating Trustee shall determine, in accordance with this Plan, when to make a Subsequent Distribution based on the amount of Cash currently available in the Liquidating Trust.

D.    Interest on Claims.    Unless otherwise specifically provided for in this Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Claim Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.    To the extent otherwise provided for in this Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall accrue on Claims at the applicable non-default rate.    Unless otherwise specifically provided for in this Plan, the Confirmation Order, or required by applicable bankruptcy law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Until the Effective Date, nothing herein shall waive the right of any creditor to seek postpetition interest.

E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.    Distributions to Holders of Allowed Claims shall be made by the Liquidating Trustee (i) at the addresses set forth on the proofs of claim filed by such Claim Holders (or at the address set forth in any applicable

notice of assignment of claim or notice of change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of claim, (iii) at the addresses reflected in the Schedules if no proof of claim has been filed and the Liquidating Trustee have not received a written notice of a change of address, or (iv) as to any defendant to a Litigation Claim who has not otherwise filed a proof of claim, at the address of such defendant's counsel of record or to such party as counsel of record directs or specifies.

2. If any Claim Holder's distribution is returned as undeliverable, no further distributions to such Claim Holder shall be made unless and until the Liquidating Trustee is notified of such Claim Holder's then current address, at which time all missed distributions shall be made to such Claim Holder without interest. Amounts in respect of undeliverable distributions shall be returned to the Liquidating Trustee until such distributions are claimed. All claims for undeliverable distributions shall be made on the later of the first (1st) anniversary of the Effective Date or ninety (90) days from the date the Claim becomes an Allowed Claim. After such date, all unclaimed property relating to distributions to be made on account of such Claims shall revert to the Liquidating Trust, free of any restrictions thereon or Claims of such Holder and notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

F. **Record Date for Distributions**. The Liquidating Trustee shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim or Interest that occurs after the Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the Record Date. The Liquidating Trustee shall instead be entitled to recognize and deal with for all purposes under the Plan with only those record Holders stated on the official claims register or the official transfer ledger, as the case may be, as of the Record Date.

G. **Allocation of Plan Distributions Between Principal and Interest**. Except as otherwise provided in the PrePetition Credit Agreement with respect to the LSA Claims, to the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

H. **Means of Cash Payment**. Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the discretion of the Liquidating Trustee, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Liquidating Trustee, as applicable.

I.      <u>Setoffs</u>.  The Liquidating Trustee may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim; provided, however, that neither the Liquidating Trustee's failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trustee of any such claim that the Debtors may have against such Holder; provided further, however, that any proposed setoff shall be subject to at least five (5) days' notice to an affected Claim Holder and, in the event of such Holder's objection, an expedited hearing, subject to the Bankruptcy Court's availability.

J.      <u>De Minimis Distributions</u>.  Notwithstanding any other provision of this Plan, the Liquidating Trustee shall have no obligation to make a distribution on account of an Allowed Claim or account to a specific Holder of an Allowed Claim if the amount to be distributed to that Holder is less than $50.00.  In addition, the Liquidating Trustee shall have the right to request subsequent relief from the Bankruptcy Court to exclude Holders of smaller Claims from the final distribution under this Plan to the extent that the amounts otherwise distributable to such Holders in connection with such final distribution would be *de minimis* or create undue administrative expense.

K.      <u>Release of Liens</u>.  Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document created or assumed in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all mortgages, deeds of trust, liens, pledges or other security interests against the property of any Debtors' Estates shall be fully released and discharged, and all of the right, title and interest of any Holder of such mortgages, deeds of trust, liens, pledges or other security interests shall revert to the Debtors' Estates and its successors and assigns.  To the extent that any termination statements, instruments of satisfaction, or other similar releases of interests necessary to terminate or otherwise remove from title or record any filed financing statements, mortgages, or other documents or agreements evidencing a security interest in the Debtors' assets shall not have been delivered to the Debtors in proper form for filing and executed by the appropriate parties prior to, or in connection with, the satisfaction of the Secured Claims, then the Liquidating Trustee is hereby authorized to (a) execute and file such statements, instruments, releases or other documents on behalf of the Holder of the Secured Claim with respect to the encumbered assets and (b) to file, register, or otherwise record a certified copy of the Confirmation Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all security interests in the Debtors' assets of any kind or nature whatsoever.

## ARTICLE XII.
## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

A.      <u>Objection Deadline; Prosecution of Objections</u>.  The Liquidating Trustee shall retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving and making distributions on account of the respective Claims against the Debtors.  No later than the Claims Objection Deadline (unless extended by an order of the Bankruptcy Court, including automatic bridge Orders), the Liquidating Trustee shall File objections to Claims with

the Bankruptcy Court and serve such objections upon the Holders of each of the Claims to which objections are made.  Moreover, notwithstanding the expiration of the Claims Objection Deadline and unless subsequently ordered for good cause shown to shorten time, the Liquidating Trustee shall continue to have the right to amend any objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed.  In accordance with Article IX of this Plan, the Liquidating Trustee shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction on the validity, nature and/or amount thereof.  On motion to the Bankruptcy Court, the Claims Objections Deadline may be extended.

   B. <u>No Distributions Pending Allowance</u>.  Notwithstanding any other provision of this Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim and the remainder has become a Disallowed Claim; provided, however, that Professional fee Claims shall be governed by the Professional Fee Order and Article VII below.

   C. <u>Disputed Claims Reserve</u>.  The Liquidating Trustee shall withhold the Disputed Claims Reserve to be distributed to particular Classes under this Plan.  The Disputed Claims Reserve shall be held at a banking institution designated as an authorized depository under the U.S. Trustee Guidelines in the District of Delaware and shall be equal to 100% of distributions to which Holders of Disputed Claims in Classes 3 or 4 would be entitled under this Plan as of such date if such Disputed Claims in Classes 3 or 4 were Allowed Claims in their (a) Pro Rata Face Amount (or if a Disputed Claim is unliquidated with no Face Amount, then based upon the good faith estimate of such Disputed Claim as estimated by the Liquidating Trustee), or (b) estimated amount of such Disputed Claim as approved in an order by the Bankruptcy Court.  The Debtors or the Liquidating Trustee may request estimation for any Disputed Claim including, without limitation, any Disputed Claim that is contingent or unliquidated.  Nothing in this Plan or the Disclosure Statement shall be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.

   D. <u>Distributions After Allowance</u>.  Payments and distributions from the Disputed Claims Reserve shall be made as appropriate to the Holder of any Disputed Claim that has become an Allowed Claim, as soon thereafter as is reasonably practicable after the date such Disputed Claim becomes an Allowed Claim.  Such distributions shall be based upon the cumulative distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been Allowed on the Effective Date (excluding any present value calculations) and shall not be limited by the Disputed Claim amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to Holders of Allowed Claims.  Upon such distribution, the reserve shall be reduced by an amount equal to the amount reserved with respect to such Disputed Claim.  To the extent the amount reserved for such Disputed Claim exceeds the Allowed Amount, if any, of such Claim, the remainder shall be distributed to Holders of Allowed Class 3 or 4 Claims in accordance with this Plan.

## ARTICLE XIII.
## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

A.    Professional Fee Claims

After the Effective Date and subject to Bankruptcy Court approval, the Debtors shall pay all remaining amounts owing to Professionals for all outstanding amounts relating to prior periods through the Effective Date approved by the Bankruptcy Court in accordance with the Professional Fee Order subject to the caps set forth in the Budget approved as part of the Final DIP Order; provided, however, that Professionals (other than the Committee Professionals) and professionals of the PrePetition Administrative Agent may be paid on a Pro Rata basis in excess of the caps from the Professional Excess Sale Proceeds; provided, further, however, that to the extent there are no Professional Excess Sale Proceeds, Ciardi, Ciardi & Astin shall be reimbursed up to $6,000 by the Liquidating Trust for allowed and unsatisfied expenses (if any) incurred during these Chapter 11 Cases, which payment shall be made *pari passu* with payments, if any, made to Committee Professionals.  The Confirmation Order shall provide procedures for the filing or final requests for approval of Allowed Professional Fees.

B.    Other Administrative Claims

All other requests for payment of an Administrative Claim, must be Filed with and served on counsel for the Liquidating Trust no later than the Administrative Claims Bar Date.  In the event that the Debtors, the Committee or the Liquidating Trustee object to an Administrative Claim and the objector and such claimant are unable to resolve their dispute consensually, then the Debtors, the Committee or the Liquidating Trustee shall request a hearing before the Bankruptcy Court to determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, the Debtors or the Liquidating Trust may pay, in their discretion, in accordance with the terms and conditions of any agreements relating thereto, any Administrative Claim as to which no request for payment has been timely Filed but which is paid or payable by a Debtor in the ordinary course of business.

## ARTICLE XIV.
## CONFIRMATION AND CONSUMMATION OF THE PLAN

A.    Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Article XIV(C) herein:

1.    The Bankruptcy Court shall have approved by Final Order a Disclosure Statement with respect to the Plan in form and substance reasonably acceptable to the Debtors and the Committee.

2.    The Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Committee.

B.    Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

1.       The Confirmation Order shall be in form and substance acceptable to the Debtors and the Committee and shall have been entered by the Bankruptcy Court and shall be a Final Order, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

2.       All relevant transactions set forth in Article VI of this Plan shall have been entered into and all conditions precedent to the consummation thereof shall have been satisfied.

3.       Any order necessary to satisfy any condition to the effectiveness of the Plan shall have become a Final Order and all documents provided for under the Plan shall have been executed and delivered by the parties thereto.

4.       The Sale shall be approved by an Order of this Court in a form acceptable to the Debtors and the Committee, and for which Order no stay pending appeal has been issued, and the Sale shall have consummated and closed.

5.       James Gelly, Mark Patterson, MRP Holdings, LLC, David Koffman, Anthony Miele, Sunset Marathon Partners, and Fox Hunt Wine Collectors, LLC shall have executed any and all documents necessary to assign to the Liquidating Trust any of their respective rights or interests (or any rights and interests owned by any Affiliate, Subsidiary, or company under their, or common, ownership and/or control) in any LSA Claim.

C.       Waiver of Conditions

The conditions set forth in Article XIV of this Plan may be waived, in whole or in part, by the Debtors and the Committee.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their reasonable discretion based on the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**ARTICLE XV.**
**RELEASE, INJUNCTIVE AND RELATED PROVISIONS**

A.       Binding Effect; Plan Binds All Holders of Claims and Equity Interests

1.       On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtors and all present and former Holders of Claims against and Equity Interests in any Debtor, and their respective Related Persons, regardless of whether any such

64

Holder of a Claim or Equity Interest has voted or failed to vote to accept or reject the Plan.

2.      Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party, including without limitation, the DIP Agent, the PrePetition Administrative Agent and any Holder of LSA Claims, may execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to effect a transfer of property, a satisfaction of a Lien or a release of a Claim dealt with by the Plan and to perform any other act, including without limitation the execution of documents necessary to effectuate the Liquidating Trust and all other documents set forth or contemplated in the Plan, that are necessary for the consummation of the Plan and the transactions contemplated herein.

B.      <u>No Discharge of Claims Against Debtors</u>.  Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; provided, however, that no Holder of a Claim against any Debtor may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, any Debtor, their respective successors or their respective Estates, except as expressly provided herein.

C.      <u>Termination of Subordination Rights and Settlement of Related Claims and Controversies</u>.  The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, arising under section 510 of the Bankruptcy Code, or otherwise.  Except as provided in this Plan, all such subordination rights that a Holder of a Claim or Interest may have with respect to any distribution to be made pursuant to the Plan will be cancelled and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.  Accordingly, distributions pursuant to the Plan to Holders of Allowed Claims or Allowed Interests will not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.  Nothing in this Article XV shall be deemed to release the rights, if any, that the Debtors, the Committee or the Liquidating Trustee or any other party in interest may have to seek to equitably subordinate any Claim pursuant to section 510 of the Bankruptcy Code or to otherwise seek to recharacterize any Claim as an equity interest.

D.      <u>Compromise and Settlement of Claims, Interests, and Controversies</u>.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, including, but not limited to, distributions to holders of Allowed LSA Claims and Allowed General Unsecured Claims, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or

settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  After the Effective Date, the Liquidating Trustee may, and shall have the exclusive right to, compromise and settle any Claims against them and any Debtor Causes of Action they may have against any other Person or Entity without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtors as of the Effective Date.

E.    **Debtors' & Committee's Releases.  Pursuant to Section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Debtor Releasees and the Committee Releasees to facilitate the settlement reached with the plan participants and the implementation of the Plan, on and after the Effective Date, the Debtor Releasees, the Committee Releasees and their attorneys and advisors are deemed released and discharged by the Debtors and the Estates from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the bankruptcy cases, the Sale, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any of the Debtor Releasees and the Committee Releasees, the restructuring of claims and interests during the bankruptcy cases, the negotiation, formulation or preparation of the Plan or related agreements, instruments, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission that constitutes the failure to perform the duty to act in good faith and where such failure to perform constitutes willful misconduct, gross negligence or fraud.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any of the Debtor Releasees, the Committee Releasees or their attorneys and advisors under the Plan or any document, instrument or agreement executed to implement the Plan, nor does it release any retained claims or other cause of action, obligation or liability expressly preserved by the Plan.  Nothing in this paragraph (or elsewhere in this Plan) shall release any Debtor Releasees, the Committee Releasees and their attorneys and advisors from: any actions taken by any Debtor Releasees, Committee Releasees or their attorneys and advisors that may be determined by a final, non-appealable order of the Bankruptcy Court to be improper under applicable law with regard to the Sale process.**

F.    **PrePetition LSA Releases.  Pursuant to the PrePetition Lender/Committee Settlement, and Section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the PrePetition LSA Releasees to facilitate the settlement reached with the plan participants and the implementation of the Plan, on and after the Effective Date the PrePetition LSA Releasees are deemed released and discharged by the Debtors and the Estates from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims (including, for the**

avoidance of doubt, any claims by the Committee or the Liquidating Trustee), asserted or assertable on behalf of the debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the PrePetition Credit Agreement or the PrePetition LSA Releasees' actions taken, or not taken, or other conduct, in their respective roles as an LSA Lender or PrePetition Administrative Agent; provided, however, that nothing in this paragraph (or elsewhere in this Plan) shall release the PrePetition LSA Releasees from: (i) other than the Debtor Releasees specifically referenced herein, any actions taken in the capacity of a Director or Officer of the Debtors; (ii) any Avoidance Action, unless the transfers sought to be avoided were transfers in satisfaction of obligations that were due and owing under, or in connection with, the PrePetition Credit Agreement (including, without limitation, any transfers to or for the benefit of the Prepetition Administrative Agent or its counsel); (iii) any actions taken by any PrePetition LSA Releasee that may be determined by a final, non-appealable order of the Bankruptcy Court to be improper under applicable law with regard to the Sale process; or (iv) any actions, damages or Claims that are the result of fraud, gross negligence or willful misconduct. For the avoidance of doubt, the Releases set forth herein shall include a waiver and Release of the ability to challenge the validity, priority, enforceability, scope or nature of the liens and security interests related to the PrePetition Credit Agreement, or to seek to recharacterize, subordinate or otherwise invalidate those liens and security interests (other than with respect to the Free and Clear Assets). Nothing in this paragraph or elsewhere in this Plan shall provide any release of any nature to Parking Source LLC, its Affiliates, subsidiaries, members, managers, owners, officers, directors, Insiders or other Related Parties, and the Liquidating Trustee will retain the right to prosecute the Debtors' claims that are the subject of *Boomerang Systems, Inc., et al, v Parking Source LLC, et al,* Case No 15-06524 (S.D.N.Y.) and any similar or related claims.

G.    **DIP Lender Releases**.  Pursuant to Section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the DIP Lender Releasees to facilitate the settlement reached with the plan participants and the implementation of the Plan, on and after the Effective Date, the DIP Lender Releasees are deemed released and discharged by the Debtors and the Estates from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the DIP Lender Releasees' actions taken, or conduct, in their respective role as a DIP Lender arising, in whole or part, from the DIP Lenders' participation in these Chapter 11 Cases, including, without limitation, any involvement by the DIP Lenders in the negotiation of this Plan, the Sale of the Sale process, or any other act or omission, transaction, agreement, event or occurrence taking place at or before the Effective Date; provided, however, that nothing in this

paragraph (or elsewhere in this Plan) shall release the DIP Lender Releasees from: (i) other than the Debtor Releasees specifically referenced herein, any actions taken in the capacity of a Director or Officer of the Debtors; (ii) any actions taken by any DIP Releasee that may be determined by a final, non-appealable Order of the Bankruptcy Court to be improper under applicable law with regard to the Sale process; or (iii) any actions, damages or Claims that are the result of fraud, gross negligence or willful misconduct of the DIP Lender Releasee against whom such claim is asserted.

H.    **Releases by the PrePetition LSA Lenders** .  As of the Effective Date, except as otherwise provided in the Plan, and to the fullest extent authorized by applicable law, each PrePetition LSA Lender expressly, unconditionally, generally and individually and collectively releases, acquits and discharges the PrePetition Administrative Agent and its Professionals from any and all actions, claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever (including any derivative claims asserted on behalf of the Debtors), whether known or unknown, foreseen or unforeseen, unmatured or matured, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, that each such PrePetition LSA Lender would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any such PrePetition LSA Lender, the restructuring of Claims and Interests before or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any such PrePetition LSA Lender on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a PrePetition LSA Releasee that constitutes willful misconduct or gross negligence.   Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

I.    **Exculpation**.  The Debtor Releasees, the Committee Releasees, shall not have or incur any liability to, or be subject to any right of action by, any Holder of any Claim against or an Equity Interest in the Debtors, or any other party in interest, or any of their respective Related Persons, for any act or omission in connection with, or arising out of, the Chapter 11 Cases and the Plan, the solicitation of acceptances of the Plan, the confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, the offer and issuance of any securities under the Plan, except for acts or omissions constituting actual or intentional fraud, gross negligence, willful misconduct or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction.

**J.      Injunction.  Except as otherwise provided in the Plan (and subject to the limitations of the Releases set forth above) or in any document, instrument, release or other agreement entered into in connection with the Plan or approved by order of the Bankruptcy Court, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons or Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors are (i) permanently enjoined from taking any of the following actions against the Estate(s), the Released Parties or any of their respective property on account of any such Claims or Equity Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtors , the Released Parties or their respective property on account of such Claims or Equity Interests:  (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons or Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under or in connection with the Plan; and provided further, however, that nothing herein shall be deemed to enjoin any action that is not otherwise Released pursuant to the provisions of Paragraph (E) above.**

**By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in this Article XV(J).**

K.      Setoffs.  Except as otherwise provided herein, the Liquidating Trust pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim (other than DIP Facility Claims or LSA Claims ) or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Debtor Causes of Action of any nature that such Debtor or Liquidating Trust, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Debtor Causes of Action against such Holder have not been otherwise compromised, waived or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise);  provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Liquidating Trust of any such Claims, rights, and Debtor Causes of Action that the Liquidating Trust may possess against such Holder.

L.      Release of Liens.  Except as otherwise provided herein, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder

of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Trust and its successors and assigns.

## ARTICLE XVI.
## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests;

(b)      resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(c)      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(d)      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(e)      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(f)      resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, including, without limitation, any other contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(g)      modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(h)      hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Liquidating Trust, including counsel fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(i)      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)      hear and determine causes of action by or on behalf of the Debtors or the Liquidating Trust;

(k)      hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(l)      hear and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m)      determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order or any contract, instrument, release (including the releases in favor of the Released Parties) or other agreement or document created in connection with the Plan or the Confirmation Order;

(n)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(o)      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(p)      enter orders closing the Chapter 11 Cases.

## ARTICLE XVII.
## MISCELLANEOUS PROVISIONS

A.    <u>Immediate Binding Effect</u>.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors , and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromise s, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    <u>Payment of Statutory Fees</u>

All Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. section 1930(a), plus interest due and payable under 31 U.S.C. section 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business, until the earliest of:  (i) the entry of a Final Decree, (ii) dismissal of the Chapter 11 Cases, or (iii) conversion of the Chapter 11 Cases to chapter 7.

C.    <u>Modification of Plan</u>

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code.  After the entry of the Confirmation Order, the Debtors or the Liquidating Trust, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

D.    <u>Revocation of Plan</u>

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors prior to the Confirmation Date and to File subsequent Plans of reorganization.  If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors, except as otherwise provided by the Debtors, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtors or any other Person or Entity or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

E.      Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

G.      Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Liquidating Trust shall be served on the Liquidating Trustee. Contact information for the Liquidating Trustee will be provided in the Confirmation Order.

H.      Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      Entire Agreement

On the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

K.    Nonseverability of Plan Provisions upon Confirmation

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified; and (3) nonseverable and mutually dependent.

L.    Closing of Chapter 11 Cases

The Liquidating Trust shall, promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.    Section 1125(e) Good Faith Compliance

The Debtors and the Committee, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

[Concluded on Following Page]

N.      No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

Respectfully submitted, as of the date first set forth above,

BOOMERANG SYSTEMS, INC.


By:    /s/ James Gelly
Name:  James Gelly
Title:    Chief Executive Officer


BOOMERANG SUB, INC.


By:    /s/ James Gelly
Title:  Chief Executive Officer


BOOMERANG USA CORP.


By:    /s/ James Gelly
Title:  Chief Executive Officer


BOOMERANG MP HOLDINGS, INC.


By:    /s/ James Gelly
Title:  Chief Executive Officer